[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 1, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-12545
_____

D. C. Docket No. 02-02115-CV-T-26-EAJ

MARK TELLO,
on behalf of himself and all
others similarly situated,

                                        Plaintiff-Appellee,

versus

DEAN WITTER REYNOLDS, INC.,
n.k.a. Morgan Stanley DW Inc.,
PAUL GRANDE,

                                        Defendants-Appellants,

 MARK RODGERS,

                                        Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 1, 2005)

Before EDMONDSON, Chief Judge, and BIRCH and FARRIS[*], Circuit Judges.

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

BIRCH, Circuit Judge:

This interlocutory appeal presents the issue of whether the amended statute of limitations in the Public Company Accounting Reform and Investor Protection Act of 2002, known as the Sarbanes-Oxley Act ("SOA"), 28 U.S.C. § 1658(b), revives securities fraud actions that were time-barred before the effective date of the SOA. Determining that the new limitations period revives actions that previously were time-barred, the district judge denied the motion to dismiss. We VACATE the district court's order and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

On November 15, 2002, E. Paul Roberts filed a class-action complaint for securities fraud and alleged that Mark Rodgers,[1] a former broker for defendant-appellant Dean Witter Reynolds, Inc., currently known as Morgan Stanley DW, Inc., manipulated the price of e-Net stock by engaging in a short squeeze.[2] The

_____

[1] Mark Tello replaced E. Paul Roberts as lead plaintiff pursuant to the district court's April 25, 2003, order granting Roberts's motion for substitution of plaintiff. R1-38.

[2] A "short squeeze" is a
> situation when prices of a stock or commodity futures contract start to move up sharply and many traders with short positions are forced to buy stocks or commodities in order to cover their positions and prevent losses. This sudden surge of buying leads to even higher prices, further aggravating the losses of short sellers who have not covered their positions.

John Downes & Jordan Elliot Goodman, Barron's Finance & Investment Handbook 807 (6th ed. 2003). Roberts, who invested in e-Net securities and lost "more than $680,000.00," purports to

2

conduct allegedly began on January 1, 1998, and ended on August 19, 1998. Dean Witter, Rodgers, and defendant-appellant Paul Grande (collectively, "Dean Witter") purportedly manipulated the stock by deceptively contriving the market prices of e-Net stock for the purpose of creating and maintaining artificially high market prices. Dean Witter allegedly accomplished this manipulation by engaging in unauthorized trading in the accounts of specific Dean Witter customers to stabilize the price of e-Net stock. Dean Witter purportedly furthered the success of the scheme by creating and promoting a plan to withhold stock from short sellers to effect a short squeeze and by making false statements to discourage clients from selling e-Net stock.

On October 1, 2002, the Securities and Exchange Commission ("SEC") issued an Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions ("SEC Order"). The SEC Order censured and fined Dean Witter, suspended and fined Grande, and fined and barred Rodgers from association with any broker or dealer. Alleging violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act,

---

have sustained the greatest financial loss of the class members. R1-12 at 2.

3

Roberts filed his complaint on behalf of himself and class members similarly situated on November 15, 2002.

The SOA, which establishes the applicable statute of limitations for securities fraud as two years from the date of discovery or five years from the date of the violation, became effective on July 30, 2002. 28 U.S.C. § 1658(b). On January 23, 2003, Dean Witter moved to dismiss the complaint based on statute-of-limitations grounds and argued that the new limitations period under the SOA does not revive claims that expired before its effective date. The district judge in the Middle District of Florida determined that the new limitations period revives previously time-barred claims and denied Dean Witter's motion to dismiss.[3]

In an amended order, the original district judge determined that the complaint, filed after the effective date of the SOA, was timely and overcame Dean Witter's motion to dismiss: "The effective date, which is July 30, 2002, hinges on the date that 'proceedings' commence or commenced rather than on the date the violation occurred. This language, standing alone, seems to presume that the [Sarbanes-Oxley] Act affords redress for violations that had already occurred before July 30, 2002." R1-31 at 6. The district judge further found that the legislative history supported this conclusion.

_____

[3] This order was issued by the Honorable Richard A. Lazzara, who subsequently recused himself, and the case was transferred to the Honorable Steven D. Merryday.

Nevertheless, the district judge also decided that "[t]he controlling question of law is whether time-barred claims are revived by the Sarbanes-Oxley Act," and that legal interpretation of the new statutory language warranted an interlocutory appeal to our court. Id. at 8. Consequently, the judge permitted Dean Witter to seek appellate review in this court. We granted Dean Witter's petition for interlocutory appeal. Prior to addressing the statute-of-limitations issue presented, we explain the necessity for additional factfinding by the district court.

## II. DISCUSSION

A. Review Standards

"We review the district court's interpretation and application of statutes of limitations de novo." United States v. Clarke, 312 F.3d 1343, 1345 n.1 (11th Cir. 2002) (per curiam). Because we have been asked to decide whether the revised statute of limitations under the SOA revives time-barred claims, we must interpret § 1658(b). With securities laws, "as in other contexts, the starting point in construing a statute is the language of the statute itself." Randall v. Loftsgaarden, 478 U.S. 647, 656, 106 S.Ct. 3143, 3149 (1986). The "cardinal canon" of statutory interpretation is "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149 (1992). In addition to the

5

"particular statutory language at issue," federal courts also must consider "the language and design of the statute as a whole" to determine "the plain meaning of the statute." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1818 (1988).

At the threshold point of our analysis, the statutory language, there is a telling wording distinction between the formerly used statute of limitations and the statute of limitations under the SOA. Prior to the effective date of the SOA statute of limitations, July 30, 2002, the formerly used statute of limitations for federal securities claims under Section 10(b) and Rule 10b-5 of the Exchange Act provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation <u>and</u> within three years after such violation." 15 U.S.C. § 78i(e) (emphasis added). 15 U.S.C. § 78i(e); <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 364 & n.9, 111 S.Ct. 2773, 2782 & n.9 (1991); <u>Theoharous v. Fong</u>, 256 F.3d 1219, 1228 (11th Cir. 2001). This statute of limitations is stated conjunctively. Under the plain terms of that statute of limitations, the complaint must be filed within one year of the facts that caused the securities violation <u>and</u> within three years of that violation. Because the class-action complaint, filed on November 15, 2002, alleges applicable securities fraud

violations that occurred from January through August 19, 1998, the two-part conjunctive test for that statute of limitations was not met, and the class action would have been untimely under the formerly applicable statute. This would be true even if discovery of the facts evidencing the securities violation occurred outside the three-year period from occurrence of the violative conduct.

In contrast, the subject statute of limitations for applicable securities actions under the SOA, which we have been asked to interpret, provides:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of—
> (1) 2 years after the discovery of the facts constituting the violation; or
> (2) 5 years after such violation.

28 U.S.C. § 1658(b) (emphasis added). Since the SOA statute of limitations is stated disjunctively, a complaint filed after July 30, 2002, the effective date, would be timely if it was filed two years after discovery of the facts evidencing the securities fraud, inquiry notice, or five years after the fraudulent conduct, a procedural statute of repose.[4] By its explicit terms, the SOA statute of limitations applies solely to cases concerning securities fraud. The Historical and Statutory

---

[4] Regarding the definiteness of a statute of repose, the Supreme Court recognized that the purpose of the limitations period "is clearly to serve as a cutoff" and held "that tolling principles do not apply." Lampf, 501 U.S. at 363, 111 S.Ct. at 2782.

7

Notes to this section clarify that this "limitations period . . . shall apply to all proceedings addressed by this section that are <u>commenced on or after the date of enactment of this Act [July 30, 2002]</u>."  28 U.S.C. § 1658 (Historical & Statutory Notes) (emphasis added).  They further specify: "Nothing in this section . . . shall create a new, private right of action."  <u>Id.</u>  Therefore, the SOA lengthens the statute of limitations for federal securities fraud cases prospectively from a one-year/three-year scheme to a two-year/five-year scheme.

B. <u>Plain Meaning</u>

By its plain terms, the purpose of § 1658(b) is to state the two points in time that a private action for securities fraud may be brought.  Under a plain, facial reading of the SOA statute of limitations, there is built-in, limited retroactive application for the earlier of two years after discovery of the facts constituting the securities violation or five years after the violation as to fraudulent securities conduct that occurred prior to its enactment.  These limitation dates necessarily create a closed class of cases eligible to be filed within two years of discovery of the securities fraud or within the five-year repose period from the securities violation.

Regarding the plain meaning of statutes of limitation, the Supreme Court has held analogously that an EEOC petitioner was able to take advantage of Congress's

8

enactment of an amended statute of limitations that extended the time within which to file suit, "[s]ince Congress also applied the enlarged limitations period to charges, whether or not untimely on" the enactment date. International Union of Elec., Radio & Machine Workers v. Robbins & Myers, Inc., 429 U.S. 229, 242, 97 S.Ct. 441, 450 (1976). The Court reasoned that application of the statute to all cases filed after enactment, even if the plaintiff had not filed a complaint before enactment and, consequently, would have been barred under the old limitations period, still would have permitted the plaintiff to file a complaint after enactment of the new limitations period. Since the new statute of limitations authorized filing of a complaint not previously filed to revive a barred claim, the Court did not interpret "pending" to mean only claims timely when filed; instead, it interpreted the statute literally irrespective of whether barred claims would be revived and the absence of specific revival language in the new statute.[5] Id. at 242-43, 97 S.Ct. at

---

[5] The Court has explained the legislative nature of statutes of limitation, which

> have come into the law not through judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never before been regarded as what now is called a "fundamental" right or what used to be called a "natural" right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

Chase Secs. Corp. V. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142 (1945) (footnote omitted).

9

450.

In a 1984 amended statute of limitations to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), similarly worded to § 1658(b), our circuit concluded that the respondent, who had worked in shipyards from 1941 to 1969, but who did not have his hearing loss conclusively diagnosed as resulting from that employment until 1986, when the former statute of limitations would have barred his claim, was entitled to file his claim and recover under the amended statute of limitations. Alabama Dry Dock & Shipbuilding Corp. v. Sowell, 933 F.2d 1561 (11th Cir. 1991), overruled on other grounds, Bath Iron Works Corp. v. Director, Office of Workers' Comp. Programs, 506 U.S. 153, 113 S.Ct. 692 (1993). The amended statute stated that "[t]he time for filing . . . a claim for compensation . . . shall not begin to run in connection with any claim for loss of hearing . . . until the employee has received an audiogram, with the accompanying report thereon, which indicates that the employee has suffered a loss of hearing." Id. at 1563 (quoting 33 U.S.C. § 908(c)(13)(D) (1986)). Congress provided that the amended statute, which was effective on enactment, September 28, 1984, "shall apply both with respect to claims filed after such date and to claims pending on such date." Id. at 1563-64 (quoting 33 U.S.C. § 901 note). We determined that Alabama Dry Dock's argument that the respondent's claim "was time-barred years

10

before those amendments were even a gleam in Congress' eye," was an "interpretation . . . at odds with the plain terms of the 1984 amendments." Id. at 1564. Rejecting Alabama Dry Dock's argument that Congress did not intend to resurrect claims for which the statute of limitations had expired and could have meant the statute to apply retroactively only to claims that were timely under the old limitations statute when the amended statute was enacted, we reasoned that such a interpretation

> would force upon Congress' words a rather strained construction. The provision that "the amendments made by this Act shall be effective on the date of enactment of this Act and shall apply . . . to claims filed after such date" (emphasis added) is obviously not necessary to apply the new law to claims arising after the effective date. The only sensible reading of the provision, then, is that Congress was addressing claims that arose before the effective date of the statute but were filed after the effective date.
> Once we have concluded that Congress was addressing claims that arose before the statute's effective date, the improbability of [Alabama Dry Dock's] reading becomes obvious. Because [Alabama Dry Dock's] interpretation posits that Congress could not have meant to resurrect claims for which the statute of limitations had expired before the effective date, Congress could not have been addressing any claims that arose before September 28, 1983, one year before the effective date of the statute, because such claims would have been time-barred before Congress ever enacted the amendments. In other words, [Alabama Dry Dock] argues, when Congress said that the 1984 amendments "shall apply . . . with respect to claims filed after" the effective date, Congress really meant to say that the amendments would apply to claims arising no more than one year before September 27, 1984, and filed after September 27, 1984. To accept [Alabama Dry Dock's] interpretation, we would have to believe that to express this rather precise concept, Congress chose the statutory

11

command that the amendments "shall apply . . . with respect to claims filed after such date." We do not. Instead, <u>we conclude that Congress intended the natural implication of the language Congress chose: the 1984 amendments apply to claims filed after September 27, 1984, whenever they arose</u>.

<u>Id.</u> (omissions in original) (fifth emphasis added).

We also noted that our predecessor circuit made a similar decision concerning the 1972 amendments to the LHWCA. <u>Id.</u> at 1565 (citing <u>Cooper Stevedoring v. Washington</u>, 556 F.2d 268, 272-73 (5th Cir. 1977)). Although the injury had occurred three months before enactment of the 1972 amendments, the former Fifth Circuit determined "that retroactive application of the 1972 amendments was 'in accord with the established principle . . . that "statutes of limitation go to matters of remedy, not to destruction of fundamental rights."'" <u>Id.</u> (quoting <u>Cooper</u>, 556 F.2d at 273 (quoting <u>Chase Secs. Corp. v. Donaldson</u>, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142 (1945))). Given the resolution in our circuit precedent addressing the statute of limitations in the 1972 amendment to the LHWCA, a remedial statute, we determined that a plain, literal interpretation of the subsequent 1984 amendments yielded the same conclusion that previously time-barred claims were intended by Congress to be appropriately filed under the extended statute of limitations:

> Our research and reflection therefore leave us convinced that when Congress provided that the 1984 amendments would "apply . . . with

respect to claims filed after" the statute's effective date, it meant just that, <u>regardless of when the events underlying the claim occurred</u>. We are aware of the implications of our decision. <u>We are reluctant to ascribe to Congress an intent to amend a statute of limitations in a way that revives a potentially large number of claims that would otherwise have been time-barred decades ago. However, the plain language of the statute leaves us no choice but to reach the decision we reach today.</u>

<u>Id.</u> (emphasis added).

The Supreme Court has endorsed this facial analysis of a statute when the temporal effect is obvious from the statutory language, which obviates the need to employ the presumption against the retroactive effect of a new or amended statute as explained in <u>Landgraf v. USI Film Products</u>, 511 U.S. 244, 114 U.S. 1483 (1994): when "the temporal effect of a statute is manifest on its face, 'there is no need to resort to judicial default rules,' and inquiry is at an end." <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882, 896, 116 S.Ct. 1783, 1792 (1996) (quoting <u>Landgraf</u>, 511 U.S. at 280, 114 S.Ct. at 1505). Congress may prescribe the temporal reach of a statute by stating that it applies to pre-enactment conduct, the first step in the <u>Landgraf</u> analysis, or a statute may be silent regarding temporal reach, in which case courts apply the judicial presumption against retroactivity.[6] This presumption

---

[6] The Court explained this analysis:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to

13

and analysis, however, is unwarranted when Congress states its unambiguous intention that the statute apply retroactively to pre-enactment conduct, in language comparable to § 1658(b), that the new or amended statute applies to proceedings commenced on or after enactment.  See Landgraf, 511 U.S. at 259-60, 114 S.Ct. at 1494 (stating that, if had Congress intended retroactive application, then "it surely would have used language comparable to . . . 'shall apply to all proceedings pending on or commenced after the date of enactment'" (citation omitted); accord INS v. St. Cyr, 533 U.S. 289, 318-19 & n.43, 121 S.Ct. 2271, 2289-90 & n.43 (2001) (collecting examples of unambiguous temporal statutory language providing that the statute applies to actions filed "on or after" the date of enactment, which includes violative conduct that occurred prior to the effective date of the statute); Martin v. Hadix, 527 U.S. 343, 354, 119 S.Ct. 1998, 2004 (1999) (stating that "'new provisions shall apply to all proceedings pending on or commenced after the date of enactment,' referenced in Landgraf, "unambiguously

---

judicial default rules.  When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Landgraf, 511 U.S. at 280, 114 S.Ct. at 1505.

14

addresses the temporal reach of the statute" (citation omitted)); Lindh v. Murphy,

522 U.S. 320, 329 n.4, 117 S.Ct. 2059, 2064 n.4 (1997) (recognizing from

Landgraf that statutory language such as, "'[This Act] shall apply to all

proceedings pending on or commenced after the date of enactment of this Act,'"

"might possibly have qualified as a clear statement for retroactive effect" (quoting

Landgraf, 511 U.S. at 260, 114 S.Ct. at 1494)); Rivers v. Roadway Express, Inc.,

511 U.S. 298, 307-08, 114 S.Ct. 1510, 1517 (1994) (noting that the subject statute

omitted a provision in the bill that the amendment "'shall apply to all proceedings

pending on or commenced after'" a fixed date and describing the bill as containing

"express retroactivity provisions"). Since § 1658(b) applies to actions filed on or

after its enactment, it "would necessarily . . . relate[] to conduct that took place at

an earlier date," which is pre-enactment securities fraud. Republic of Austria v.

Altman, 541U.S. 677, ___, 124 S.Ct. 2240, 2253 n.18 (2004). From analogous

Supreme Court and circuit precedent, the amended, lengthened limitations period

of § 1658(b) applies to a case that was "commenced on or after the date of

enactment" and this temporal reach inherently includes securities fraud that

occurred prior to the date of enactment.[7] 28 U.S.C. § 1658(b) (Historical &

---

[7] Section 1658(b) contains innate retroactive application, evidenced by the "commenced on or after the date of enactment" designation for filing suit. 28 U.S.C. § 1658(b) (Historical & Statutory Notes). Consequently, there is no need to progress to Landgraf's judicial presumption against retroactivity. Because of the explanatory notes, § 1658(b) is not silent as to retroactivity

15

Statutory Notes). Accordingly, § 1658(b) is applicable to the alleged fraudulent securities conduct in this case, provided inquiry notice was not sufficiently established to enable the plaintiff class to file this class action prior to issuance of the SEC Order.

C. Inquiry Notice

There is no dispute that this class action was filed on November 15, 2002, after the effective date of the SOA. What is in dispute is whether the class was sufficiently on inquiry notice before the effective date of the SOA to have been governed by the former, one-year/three-year statutory scheme for filing a securities fraud action, such that this securities class-action is time-barred. See 15 U.S.C. § 78i(e). In our circuit, discovery of facts evidencing securities misconduct "'occurs when a potential plaintiff has inquiry or actual notice of a violation.'" Theoharous, 256 F.3d at 1228 (quoting Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 670 (7th Cir. 1998)). "'Inquiry notice is 'the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights

_____

and, hence, there is no reason to utilize a judicial presumption against retroactivity, which actually overrides an explicit legislative statement to the contrary. Therefore, appellate cases involving statutory provisions in which Congress was silent on the temporal reach, such as Resolution Trust Corp. v. Artley, 28 F.3d 1099, 1102-03 n.6 (11th Cir. 1994), are inapplicable. See, e.g., In re Apex Express Corp., 190 F.3d 624, 642-43 (4th Cir. 1999); Million v. Frank, 47 F.3d 385, 390 (10th Cir. 1994); Chenault v. United States Postal Serv., 37 F.3d 535, 537 (9th Cir. 1994); Resolution Trust Corp. v. Seale, 13 F.3d 850, 853 (5th Cir. 1994); Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1527 (7th Cir. 1990).

16

had been infringed.'" Id. "'[F]ull exposition of the scam'" is not necessary; "'[i]nquiry notice is triggered by evidence of the possibility of fraud.'" Id. (quoting Sterlin v. Biomune Sys., 154 F.3d 1191, 1203 (10th Cir. 1998)); Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002).

Significantly, inquiry notice is tantamount to actual notice because "'the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.'" Lampf, 501 U.S. at 363, 111 S.Ct. at 2782 (quoting Bailey v. Glover, 21 Wall. 342, 348 (1875)). An "objective reasonable person standard" is applied for this determination. Franze, 296 F.3d at 1254. "'Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" La Grasta v. First Union Secs., Inc., 358 F.3d 840, 848 (11th Cir. 2004) (quoting Marks v. CDW Computer Cntrs., Inc., 122 F.3d 363, 367 (7th Cir. 1997)).

Circumstances that create a duty of inquiry frequently are referred to as "storm warnings." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003). Consequently, an investor who receives storm warnings and does not investigate whether a securities fraud has occurred will have this knowledge imputed to him.

17

Id. "[W]hether the securities fraud claim of a plaintiff who receives 'storm warnings' is time barred 'turns on when, after obtaining inquiry notice,' the plaintiff 'in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud." Id. (citation omitted) (second alteration in original); see Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 835 (11th Cir. 1999) (acknowledging same reasonable diligence standard regarding a plaintiff's duty to investigate as to the possibility of fraud pursuant to receipt of "storm warnings" in an antitrust context), amended on other grounds, 211 F.3d 1224 (11th Cir. 2000) (per curiam).

In turn, inquiry notice triggers reasonable diligence in investigating the fraud for which notice has been received in order to obtain sufficient information to file suit. See Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir. 2000) ("We must further determine, however, when knowledge of the facts constituting the violation of Section 10(b) and Rule 10b-5 will be imputed if, after the duty to inquiry arises, the investor does indeed inquire."); Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1334 (7th Cir. 1997) ("The one-year statute of limitations applicable to suits under Rule 10b-5 begins to run not when the fraud occurs, and not when the fraud is discovered, but when (often between the date of occurrence and the date of discovery of the fraud) the plaintiff learns, or should have learned through the

18

exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year.").  The determination of <u>when</u> inquiry notice occurred and <u>how much</u> investigation is reasonable for filing suit are necessarily fact-specific to each case.  Accordingly, we have recognized that "questions of notice and due diligence are particularly suited for a jury's consideration."  <u>Kennedy v. Tallant</u>, 710 F.2d 711, 716 (11th Cir. 1983).

Regarding reasonable diligence, the Seventh Circuit, whose definition of factual discovery of a securities fraud and inquiry notice we adopted, <u>Theoharous</u>, 256 F.3d at 1228, has clarified "that inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit," <u>Marks</u>, 122 F.3d at 368.  Then Chief Judge Posner delineated the considerations that must be taken into account concerning the reasonable diligence required before suit can be filed in a securities fraud case:

> Inquiry notice . . . must not be construed so broadly that the statute of limitations starts running too soon for the victim of the fraud to be able to bring suit within a year [former statute].  <u>The facts constituting such notice must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit.</u>

But the facts that put the victim of the fraud on notice can fall short of actual proof of fraud.  How short may depend on the victim's access to the information that he will need in order to be able to plead a reasonably well substantiated and adequately particularized case of securities fraud, bearing in mind that before he files his suit he will not have the aid of compulsory process.  The better his access, the less time he needs.  "Suspicious circumstances, coupled with ease of discovering, without the use of legal process, whether the suspicion is well grounded, may cause the statute of limitations to start to run before the plaintiffs discover the actual fraud."

. . . .

. . . But more than bare access to necessary information is required to start the statute of limitations running.  There must also be a <u>suspicious circumstance</u> to trigger a duty to exploit the access; an open door is not by itself a reason to enter a room.

. . . .

<u>How</u> suspicious the circumstance need be to set the statute of limitations running—how close, in other words, it needs to be to the proof that one would have to have in hand in order to be able to file suit . . . <u>will depend on how easy it is to obtain the necessary proof by a diligent investigation aimed at confirming or dispelling the suspicion.</u>

. . . .

. . . <u>[I]nquiry notice is defined . . . to require more than merely suspicious circumstances—to require that the suspicious circumstance place the potential plaintiff in possession of, or with ready access to, the essential facts that he needs in order to be able to sue.</u>

<u>Fujisawa</u>, 115 F.3d at 1335, 1337 (citations omitted) (first, second, fourth, and fifth emphases added).

Similarly, the Tenth Circuit has struck "a balance between two competing policies underlying the securities laws":

While we recognize there is a strong federal interest in requiring plaintiffs to file suit soon after they are put on

20

notice of their claims, <u>the applicable statute of limitations should not precipitate groundless or premature suits</u> by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims.

<u>Sterlin v. Biomune Sys.</u>, 154 F.3d 1191, 1202 (10th Cir. 1998) (emphasis added).

That court further recognized the potential of valid securities fraud actions being time-barred simply because the definitive facts evidencing corporate culpability were not available or obtainable, only the effects were perceptible:

> Adopting inquiry notice as the point when the one-year limitations period begins to run, however, could lead to valid suits being barred because the plaintiff, although on inquiry notice, could not reasonably have discovered within one year sufficient facts to file a suit which satisfies the particularized pleading requirements of § 9(b). The objective of encouraging investors to file suit as soon as possible is not undermined by delaying the accrual of the statute of limitations until the plaintiffs, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud. <u>Delaying the accrual of the one-year limitations period until this time does, however, ensure the plaintiffs are given the opportunity to adequately develop the facts and determine whether those facts merit bringing suit, thus giving meaning to the term "inquiry."</u>

<u>Id.</u> (footnote omitted) (emphasis added).

Allowing time for appropriate investigation for financially injured plaintiffs to obtain the evidence of securities fraud needed to file suit comports with the purpose of the Public Company Accounting Reform and Investor Protection Act of

2002, of which the SOA is a remedial part, enacted by Congress in the wake of Enron to expand the period for unknowing victims of fraudulent conduct violative of the securities laws to seek recourse and remedies in federal court. The Senate committee reviewing this legislation intended to deter fraudulent securities conduct[8] considered the testimony of Former SEC chairman Arthur

---

[8] Deterrence of securities fraud was the critical purpose in Congress's extending the time that a perpetrator could be held liable for fraudulent securities conduct with obvious concern regarding the time plaintiffs would need to elicit the facts necessary to file suit. Concerning prevalent securities fraud, Senator Harkin explained that perpetrators of securities fraud must be punished to deter this conduct:

> [O]ur economic system is based on transparency. Investors need accurate financial information about a company so that they can make informed investment decisions. They need information they can trust. Getting honest information requires accountability and honesty from three entities: corporate executives, stock brokers, and public auditors. Clearly, we are seeing breakdowns, if not outright criminality, at all three levels. And it requires additional accountability at all three levels in order to restore investor confidence.
>
> First, we must expect that corporations present an honest portrait of the companies['] economic health and wellbeing. Corporate executives who cook[] the books are no different than used car salesmen who roll back the car odometers, both are engaged in a fraud. They must be held accountable for their actions and severely punished.
>
> Second, we must expect [that] brokers provide their investors with honest, accurate, and unbiased advice. I stress unbiased. Unfortunately, many brokerage firms have a conflict of interest because they bring in businesses and increase their own profits by pushing bad stocks. . . .
>
> Third, we have to expect that public accounting firms are acting as watchdogs over corporate financial statements. Yet many of the auditing firms, not just Arthur Andersen, have had major failures.

148 Cong. Rec. S6540 (daily ed. July 10, 2002) (statement of Sen. Harkin) (emphasis added).
Promoting the SOA in the House, Representative Jackson-Lee similarly addressed the need for punishment of corporations and corporate executives to effectuate corporate responsibility and accountability:

> Over the months we have suffered, we have watched the marketplace go up and

Levitt that "extending the statute of limitations is warranted because many securities frauds are inherently complex, and the law should not reward the perpetrator of a fraud, who successfully conceals its existence for more than three years."  S. Rep. No. 107-146, at 17 (2002); 148 Cong. Rec. S7420 (daily ed. July 26, 2002) (statement of Sen. Leahy).  In his section-by-section analysis of the extended statute of limitations before the Senate, Senator Leahy discussed and adopted Justice Kennedy's view that the Supreme Court's "'one and three'" year limitations established by Lampf made potential securities fraud cases "'all but a dead letter for injured investors who by no conceivable standard of fairness or practicality can be expected to file suit within three years after the violation

---

down, but, more importantly, I have watched my constituents living in the city of Houston and those around the Nation see their investments for retirement go down the drain.

And so I am proud to be able to join the gentleman from New York (Mr. LaFalce) and the other body who presented one of the strongest corporate responsibility and accountability bills that this Nation will ever see.  It will tell the poor guy on the street, it will tell the common thief who steals a loaf of bread and goes to jail for 5 or 10 years, that justice in America reigns not only on the streets, but in the corporate boardrooms, because we will have a board to oversee auditors and accounting features as it relates to their work for corporations; we will make sure that there is no grand profit on consulting fees and you are supposed to be telling the corporation what they are doing wrong; and we will give shareholders, the moms and dads and grandparents who have lost their investment, the right to sue so that they can recover dollars that they have lost; and, yes, we will put in jail those who have done wrong.

Mr. Speaker, this is a good bill and I will join my colleagues today, providing leadership to the marketplace of America.

148 Cong. Rec. H5462 (daily ed. July 25, 2002) (statement of Rep. Jackson-Lee) (emphasis added).

23

occurred.'"[9] 148 Cong. Rec. S7420 (daily ed. July 26, 2002) (statement of Sen.

[9] Congress clearly was cognizant that the former, shorter statute of limitations was insufficient for plaintiffs to acquire necessary documentation in complex securities fraud cases. In his section-by-section analysis of the SOA, Senator Leahy, who introduced the bill in the Senate, addressed Section 804 and gave insights into the reasoning behind the enactment of the extended statute of limitations, although his section-by-section analysis subsequently was included in the Congressional Record, which is not an unusual occurrence:

> This section would set the statute of limitations in private securities fraud cases to the earlier of two years after the discovery of the facts constituting the violation or five years after such violation. The current statute of limitations for most private securities fraud cases is the earlier of three years from the date of the fraud or one year from the date of discovery. This provision states that it is not meant to create any new private cause of action, but only to govern all the already existing private causes of action under the various federal securities laws that have been held to support private causes of action. This provision is intended to lengthen any statute of limitations under federal securities law, and to shorten none. <u>The section, by its plain terms, applies to any and all cases filed after the effective date of the Act, regardless of when the underlying conduct occurred.</u>
>  . . . .
> Section 804 protects victims by extending the statute of limitations in private securities fraud cases. It would set the statute of limitations in private securities fraud cases to the earlier of five years after the date of the fraud or two years after the fraud was discovered. The current statute of limitations for most such fraud cases is three years from the date of the fraud or one year after discovery, <u>which can unfairly limit recovery for defrauded investors in some cases. It applies to all private securities fraud actions for which private causes of action are permitted and applies to any case filed after the date of enactment, no matter when the conduct occurred.</u> As Attorney General Gregoire testified at the Committee hearing, in the Enron state pension fund litigation the current short statute of limitations has forced some states to forgo claims against Enron based on alleged securities fraud in 1997 and 1998. In Washington state alone, the short statute of limitations may cost hard-working state employees, firefighters and police officers nearly $50 million in lost Enron investments which they can never recover.
>  . . . .
> <u>In fraud cases the short limitations period under current law is an invitation to take sophisticated steps to conceal the deceit.</u> The experts have long agreed on that point, but unfortunately they have been proven right again. As recent experience shows, it only takes a few seconds to warm up the shredder, but unfortunately <u>it will take years for victims to put this complex case back together again. It is time that the law is changed to give victims the time they need to prove their fraud cases.</u>

24

Leahy) (quoting <u>Lampf</u>, 501 U.S. at 377, 111 S.Ct. at 2790) (Kennedy, J., dissenting)).

The Supreme Court has "repeatedly recognized that securities laws combating fraud should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'" <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 386-87, 103 S.Ct. 683, 689 (1983) (quoting <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 195, 84 S.Ct. 275, 284 (1963)) (alteration in original). The SOA, of which § 1658(b) is an integral part, was enacted to protect investors who unknowingly may be subjected to fraudulent securities schemes and to give them recourse and relief in the federal courts. Given this clear Congressional purpose of the SOA, we want to be cautious and certain before denying the plaintiff class an opportunity to have the facts revealed in discovery and, potentially, a decision following a trial. Importantly, this class action is not a re-filing of a previous suit under the formerly applicable statute of limitations, but the initial filing of this case following the issuance of the SEC Order to Dean Witter, the alleged first knowledge of the plaintiff class of Dean Witter's securities fraud concerning e-Net stock. With considerable financial losses at stake by the plaintiff class members, it seems illogical that they would have neglected to file

---

148 Cong. Rec. S7418, S7419, S7420 (daily ed. July 26, 2002) (statement of Sen. Leahy) (emphasis added).

25

suit if they had known of Dean Witter's securities fraud, particularly given the alacrity with which suit was filed upon issuance of the SEC Order.

This practical reasoning makes sense because unsubstantiated knowledge is an insufficient basis for filing actions for violations of the securities laws, and, waiting until such facts are developed and available, promotes judicial efficiency and justice. Rather than revert to the former statute of limitations automatically, the developed facts of this case could show it to be governed by the SOA statute of limitations and that this is the type of securities fraud case that Congress intended to be covered when it extended the statute of limitations for filing suit, a remedial purpose designed to help financially injured plaintiffs by deciding their cases on the merits and not to shut them out of court procedurally.[10] Because of the congressionally intended purpose of protecting and aiding investors in seeking relief in federal court from perpetrators who have financially injured them, we

---

[10] Urging passage of the SOA and the importance of the extended statute of limitations as part of fulfilling its purpose to protect investors, Senator Daschle explained:

> Finally, the amendment will protect victims of fraud. By extending the time period during which victims can bring cases to recoup their losses, the Leahy bill removes the reward for those fraud artists who are especially gifted at concealing what they've done for lengthy periods of time.
> Cases where victims have lost their entire life savings should be decided on the merits, not based on procedural hurdles that may now be used to throw legitimate victims out of court.

148 Cong. Rec. S6437 (daily ed. July 9, 2002) (statement of Sen. Daschle) (emphasis added).

conclude that inquiry notice designates the point in time when the SOA statute of limitations begins to run for the purpose of reasonably diligent investigation to substantiate the securities fraud at issue. Therefore, the task for the district judge on remand will be to determine the point in time when the plaintiff class had sufficient information of the alleged fraudulent securities conduct by Dean Witter to file this class action.

C. Application

Procedurally, this case presenting a statute-of-limitations challenge is before us on an interlocutory appeal from the denial of a motion to dismiss, limiting our consideration to the complaint and any exhibits thereto.[11] Dismissal under Federal Rule of Civil Procedure 12(b)(6) "on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred."[12] La Grasta, 358 F.3d at 845 (quoting Omar ex rel. Cannon v. Lindsey,

---

[11] "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam) (citation omitted). For review under Rule 12(b)(6), federal courts "'view the allegations of the complaint in the light most favorable to the plaintiff[s], consider the allegations of the complaint as true, and accept all reasonable inferences therefrom.'" La Grasta, 358 F.3d at 845 (quoting Omar ex rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam)) (alteration in original).

[12] At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." Knight v. E.F. Hutton & Co., 750 F. Supp. 1109, 1112 (M.D. Fla. 1990); see Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957); Summer v. Land & Leisure, Inc., 664 F.2d 965, 969 (5th Cir. Unit B 1981).

27

334 F.3d 1246, 1251 (11th Cir. 2003) (per curiam)). Attached to the class action complaint is the October 1, 2002, SEC Order censuring and fining Dean Witter and suspending or barring from association with any broker or dealer the specific Dean Witter brokers implicated. According to the statement of the complaint, this was the nationwide plaintiff class of lay persons' first knowledge of Dean Witter's fraudulent securities conduct that resulted in their significant financial losses from Dean Witter's manipulating the price of e-Net stock through a short squeeze.

In the first section of the complaint filed on November 15, 2002, entitled "Nature of the Claim," there are three paragraphs. R1-1 at 1-2. The first paragraph identifies the parties involved and the specific securities acts violated. Id. at 1. The second paragraph describes the alleged violative conduct by Dean Witter implemented by effecting a short squeeze "to discourage clients from selling e-Net." Id. at 2. The third paragraph states that the SEC issued on October 1, 2002, an "Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Act of 1934, Making Findings and Imposing Remedial Sanctions." Id. Regarding this SEC order, the paragraph continues: "The SEC Order censured and fined Defendant Dean Witter, suspended and fined Defendant Grande and fined and barred Defendant Rodgers from association with any broker or dealer. A copy of the SEC Order is attached hereto

28

as Exhibit A, and is incorporated herein in full by reference." Id.

From the complaint, with the description and attachment of the SEC Order, it appears that Roberts, although he knew that he had sustained a loss, did not know of the causative securities violations by Dean Witter until the issuance of the October 1, 2002, SEC Order. The class-action complaint was filed on November 15, 2002, a month and a half from the date of this SEC Order after learning of the conduct by Dean Witter that established securities violations in connection with his loss and that of other investors similarly situated. If this factual inference is correct, then Roberts and the other members of the class were not "delinquent plaintiffs who slept on their rights" and possibly could be unjustly rewarded for pursuing time-barred claims; instead, they fit within the new statute of limitations under the SOA, which was effective when the subject complaint was filed. Br. of Defendant-Appellant Dean Witter at 15. Notably, the district judge stated in his order from which this appeal is taken that plaintiffs' position was that the new SOA limitations period from discovery of inculpatory facts "had not expired on the date of the filing of the Complaint, November 15, 2002." R1-31 at 5 n.6.[13]

_____

[13] The SOA statute of limitations regarding discovery of facts is misstated in this footnote as three rather than two years under § 1658(b)(1), but this is a difference without a distinction, given the filing date of the complaint following issuance of the SEC Order in this case. R1-31 at 5 n.6. This statement occurs in the district judge's discussion of retroactive application of the SOA, which was the analysis, complete with legislative history, used by the district judge to conclude "that Congress intended for the extended statute of limitations to apply retroactively." Id. at 8.

Rather than "reviving" their cause of action, about which they purportedly were unknowing until the SEC Order issued, the plaintiffs' class action was filed or commenced <u>after</u> the knowledge of Dean Witter's fraudulent conduct through the SEC Order, which was <u>after</u> the new statute of limitations under the SOA had become effective on July 30, 2002. This class action was filed on November 15, 2002, roughly six weeks following the issuance of the SEC Order, well within the SOA two-year limitations period for filing an action after discovery of facts constituting the violation.[14]

Inquiry notice in our circuit as to securities fraud occurs when a potential plaintiff discovers facts evidencing securities fraud. <u>Theoharous</u>, 256 F.3d at 1228. <u>Theoharous</u>, consolidated class actions against a corporation and its chief executive officer for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, concerned allegations that they had made false and misleading statements and concealed material facts regarding the financial performance of the corporation. Analyzing the timeliness of one of the complaints, we determined that announcement by the corporation "that it was filing

---

[14] The filing date of this class action also fits the second part of the SOA statute of limitations: five years after the securities violation, because the violative conduct allegedly existed from January 1 through August 19, 1998. Plaintiffs, however, had no reason to file their class action until they <u>knew</u> that they had been injured financially by Dean Witter's securities fraud.

for bankruptcy was an indication that its previous reports of solid financial health were inaccurate" and was sufficient for "inquiry notice of the possibility that [the corporation] had violated Section 10(b) with its prior assurances of financial health." Id. at 1228. Consequently, the bankruptcy announcement marked the point in time that the one-year discovery period under the formerly applicable statute began to run, and we determined that the district court properly decided that the statute of limitations barred the action.

Franze, an interlocutory appeal from a grant of class certification, concerned whether class certification appropriately was granted for all individuals who had purchased variable life insurance policies between September 30, 1991, and January 3, 1996, from Equitable. 296 F.3d at 1251. With the then applicable one-year limitations period from discovery, the issue before our court was when the class representatives were put on inquiry notice of the securities fraud to determine whether the complaint was filed timely. We determined that the class representatives "could have discovered the alleged misrepresentations simply by reading" the policy and prospectus provided to them by Equitable. Id. at 1254; see Dobbs v. Cigna Sec., Inc., 12 F.3d 346, 352 (2d Cir. 1993) (determining that plaintiff-appellant was "on inquiry notice when she made the investments in question" because of disclosures of the risks involved in the prospectuses, which

31

made her complaint, filed "more than a year after her claim accrued" untimely). The class representatives even testified that, if they had read these documents, then they would not have purchased the variable life insurance policies. Franze, 296 F.3d at 1255. "Because inquiry notice is an objective standard, we conclude[d] that the prospectus and policy provided sufficient information to put a reasonable person on inquiry notice." Id.

While public announcement of corporate bankruptcy was sufficient for inquiry notice in Theoharous, the public, SEC Order in this case is stronger because it gave actual notice of the fraudulent securities conduct by Dean Witter with specific findings and imposing remedial sanctions. If this is the district court's determination on remand, then the complaint in this case was timely under the two-year, SOA statute of limitations from discovery of facts of the securities violation. Because the district court previously analyzed this case under retroactive application of the SOA, five-year limitations period from the securities violation, § 1658(b)(2), there was no analysis in the order on appeal of the limitations period from discovery of the facts of the securities violation, § 1658(b)(1), although this issue was briefed to the district court.

In support of its motion to dismiss the class-action complaint, Dean Witter's position in district court was that the plaintiff class was on inquiry notice of

Rodgers's alleged manipulation of e-Net stock before November 15, 2000, two years before the subject complaint was filed. R1-17 at 2. To substantiate this argument, Dean Witter noted other arbitration actions and attached to its supporting memorandum several articles from local newspapers, such as the St. Petersburg Times and The Palm Beach Post, and a single Washington Post article, as well as a Fortune magazine article, ranging in dates from 1998 through 2000, all of which were obtained from an Internet search, and 1998 comments by an investor, "watermellonman" on an Internet "chat room" message board on Yahoo Finance. Id. at Exs. 2, 3, 5, 6, 7, 8, 9, 10. On remand for the development of the facts in this case, the district judge may be unpersuaded by Dean Witter's sources of inquiry notice to a nationwide class of laypersons of its securities violations, such as local Florida newspapers and an Internet "chat" room.

Regarding articles in local Florida newspapers, available solely online to non-local residents, or an online chat-room posting by an unidentified person, we want the district judge on remand with the development of the facts to determine whether these sources of information could reasonably have reached the class members, who were geographically dispersed throughout the United States. See Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc., 120 F.3d 893, 897 (8th Cir. 1997) ("[Defendant] would have us automatically impute to [plaintiff]

33

constructive knowledge of any information available to the public, including all articles published on, and the public records available in, the [related] case, regardless of [plaintiff's] actual awareness. We cannot adopt this analysis. . . . A victim must be aware of some suspicious circumstances, some 'storm warnings,' to trigger a duty to investigate."). Even if this were the case, the district judge on remand must determine if sufficient information was provided by these sources to cause the class members to realize that Dean Witter had committed securities violations that negatively affected their investments to enable them to file a lawsuit, bearing in mind that many, if not most, of the class members are likely lay persons unknowing about the intricacies of the securities laws as to what constitutes a securities violation as opposed to simply losing money because of a market decline.[15] A similar analysis would be required to determine whether the arbitration cases cited by Dean Witter provided sufficient inquiry notice for the

---

[15] For example, one of the local newspaper articles that Dean Witter gleaned from its Internet search, a May 16, 1999, article from the St. Petersburg Times, South Pinellas Edition, merely states that "[t]he Florida Division of Securities said that it is investigating a complaint regarding Rodgers' activities." R1-17, Ex. 6 at 195. It further states: "The SEC said it can neither confirm nor deny the existence of an investigation." Id. This does not appear to be sufficient inquiry notification to enable the class representative to be able to file a complaint stating the specific securities violations by Dean Witter on behalf of the class members. See In re Physician Corp. of Am. Secs. Litig., 50 F. Supp. 2d 1304, 1319 (S.D. Fla. 1999) (concluding that defendant's press release and Form 10-Q filing were insufficient to provide inquiry notice to plaintiffs); Lilley v. Charren, 936 F. Supp. 708, 715 (N.D. Cal. 1996) (deciding that a newspaper article and analysts' reports of "a decline in the price of . . . stock, standing alone, is not evidence of fraud").

class members.[16]

The only two articles of national distribution that Dean Witter has provided as a basis for inquiry notice by Roberts and the class members are the Washington Post and Fortune articles. The Washington Post article, published September 14, 1998, and titled "A 'Doonesbury' Imitation That's No Laughing Matter," does not mention Dean Witter; therefore, it does not appear to alert the class members to Dean Witter's intent to deceive or fraudulent conduct in connection with its sale of e-Net shares sufficient to file a class-action complaint. R1-17, Ex. 3. The Fortune article, published August 14, 2000, and titled "Borrower, Beware," discusses Rodgers and e-Net stock on page five of a six-page article. Id. Ex. 8 at 110. The article does not address the broad-reaching scheme alleged by the plaintiff class members, the involvement of Dean Witter, or its pervasively inadequate internal checks and balances alleged in the complaint.

---

[16] "While the . . . press release and the subsequent filing of 19 related lawsuits may have created suspicious circumstances as to the Defendant's conduct, the Court cannot conclude as a matter of law that they provided inquiry notice of Defendant's reckless or intentional misconduct." Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1341 (N.D. Ga. 1998). In Carley, 19 publicly filed lawsuits were insufficient for inquiry notice, yet Dean Witter contends that complaints and counterclaims filed in arbitration matters, which were not even on court dockets and thus publicly available, provided inquiry notice to Roberts and the class members. Moreover, on a motion to dismiss and "to show that the [former] limitations period applies," Dean Witter "improperly relies upon evidence not referenced in the pleadings," which more appropriately should be considered on a summary-judgment motion. Id. Indeed, the district judge on remand may decide that he is unable to determine the date that we seek as to when Roberts had sufficient notice of Dean Witter's conduct with respect to e-Net stock to file a complaint on behalf of the class members without full discovery.

In contrast, our court concluded that an article in a nationally distributed magazine, <u>Smart Money</u>, was sufficient to put plaintiffs/investors in a class action on inquiry notice by alleging that a "strong buy" recommendation by a particular analyst in a securities-investment firm was made under a conflict of interest and artificially inflated the price of a specific corporate stock. <u>La Grasta</u>, 358 F.3d at 840, 848, 849. Critical to our conclusion was specific exposure in the article not only of the identities of the securities-investment firm and the particular, implicated analyst, but also the conflict of interest.[17] On remand, the district judge must determine whether either of the nationally distributed articles in this case were explicit enough to have provided inquiry notice to the plaintiff class members.

---

[17] Two other circuits have used a similar analysis to decide whether articles in magazines of national distribution provided sufficient inquiry notice. In <u>Sterlin</u>, the Tenth Circuit concluded that a <u>Barron's</u> article that "questioned whether Biomune's purpose was to create a viable product, Immuno–C, or whether it was in business simply to 'sell shares,'" plus Biomune's representation in its SEC filings that a particular investor owned no stock when he "actually owned more than 35% of Biomune's stock through a 'byzantine array of entities,'" evidenced a fraudulent representation to the SEC to obtain Biomune's NASDAQ listing was sufficient information of fraud to put plaintiffs in a securities fraud class on inquiry notice. 154 F.3d at 1204. In comparing the <u>Barron's</u> article in <u>Sterlin</u> with a <u>Forbes</u> article concerning Valence Technology, Inc., the Ninth Circuit came to the opposite conclusion in considering whether the <u>Forbes</u> article provided inquiry notice in a securities fraud, class action by stock holders: "While the article noted the checkered past of Carl Berg, one of Valence's principal investors, it did not state any facts from which it could be inferred that Valence was trying to mislead market regulators or defraud investors by hiding Berg's involvement in the company." <u>Berry v. Valence Tech., Inc.</u>, 175 F.3d 699, 705 n.8 (9th Cir. 1999). That court held that "the <u>Forbes</u> article was insufficient to induce a reasonable investor to investigate the possibility of fraud" and "that the district court erred in dismissing Plaintiffs' suit on statute of limitations grounds." <u>Id.</u> at 707.

36

Dean Witter has not asserted that prospectuses, publicly filed SEC documents, company press releases, or account statements contained meaningful disclosures that would have provided notice to the class members of the alleged fraud sufficient for inquiry notice. "It is beyond dispute that the defendants have the burden of proof in establishing the elements of the affirmative defense of the statute of limitations." Smith v. Duff & Phelps, Inc., 5 F.3d 488, 492 n.9 (11th Cir. 1993). The applicable SOA statute of limitations does not commence until Roberts and the class members "discovered, or, in the exercise of reasonable diligence, should have discovered, the alleged fraud," and Dean Witter "bear[s] the burdens of production and persuasion on that question." Id.

Significantly, general skepticism expressed in a press article about corporate conduct is insufficient "to excite inquiry into the specific possibility of fraud." Berry v. Valence Tech., Inc., 175 F.3d 699, 705 (9th Cir. 1999). Instead, "for a press article to put shareholders on inquiry notice, there must be some reasonable nexus between the allegations made in the article and the nature of the action subsequently brought." Id. (emphasis added). In addition to determination of what established inquiry notice and when that occurred, the district judge on remand must determine the point in time that Roberts, on behalf of the class members, had sufficient specific factual information of Dean Witter's violation of

37

the securities laws to file the class-action complaint. If that did not occur until the

October 1, 2002, SEC Order, then this securities-fraud class action was timely

filed on November 15, 2002, under the applicable SOA statute of limitations,

when the plaintiff class learned that their investment losses were the result of

Dean Witter's fraudulent conduct rather than a downturn in the stock market.

D. Directions

Review of the facts stated in the class-action complaint, the statutory

language, and applicable securities fraud cases indicates that this case could have

been filed timely under the SOA statute of limitations. From the factual

allegations of the complaint and the attached SEC Order, a reasonable inference is

that the plaintiff class did not know the facts of the fraudulent conduct by Dean

Witter that caused their losses relative to their e-Net stock sufficient to file their

complaint until the SEC Order issued. If the district judge on remand determines

that this is true, then the class-action complaint was filed timely within

approximately a month and a half after this knowledge, and the case should

proceed with discovery and, potentially, trial in district court. See Kennedy, 710

F.2d at 716 (recognizing in a securities-fraud case involving statute of limitations

that issues of notice and due diligence are the province of the jury); see also

Marks, 122 F.3d at 367 ("Whether a plaintiff had sufficient facts to place him on

38

inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).").

Should the district judge on remand be able to determine a date prior to the issuance of the SEC Order that the class members had sufficient factual information to file the class-action complaint, depending on when inquiry notice was effective, the statutory-interpretation issue of whether previously time-barred claims are revived by the SOA statute of limitations properly will be before us. The current record is inadequate to permit us to proceed with the statute-of-limitations issue presented to us without this critical fact. Because of the need for factual development, we have recognized that whether plaintiffs possessed facts sufficient to place them on inquiry notice of securities fraud often cannot be resolved on a Rule 12(b)(6) motion and requires discovery. La Grasta, 358 F.3d at 848. On the face of the complaint and the undeveloped record at this stage of the proceedings, it is not apparent that this class-action, securities-fraud claim is time-barred under the formerly applicable statute of limitations. The district judge must determine whether the various sources of information provided by Dean Witter were sufficient to constitute inquiry notice, and, if so, when. See id.

Significantly, at this point, this is not a case about retroactive application of a new law and revival of time-barred claims. Rather, it is a case where inquiry

notice first must be determined. Depending on the result of that factual finding, this case may require only a straightforward application of the new, remedial statute of limitations designed to encompass the securities fraud conduct at issue. If that is the case, retroactive analysis circumvents Congressional intent in enacting the SOA statute of limitations intended to cover a case, such as this, by defeating the remedial purpose of the statute.

Automatically applying the former statute of limitations, as Dean Witter urges, instead of first determining the inquiry-notice effective date to decide which statute of limitations is applicable, would be regression to all the problems caused by formerly using that statute, which the SOA statute of limitations was designed to correct by allowing more time for investors injured by securities fraud to obtain facts evidencing the fraudulent conduct sufficient to enable them to file suit. This factual determination, however, is for the district judge to make because the record before that court on a motion to dismiss was insufficient. For justice to be done, this case may need to proceed through discovery, which will reveal the actual facts. Since the SEC Order showed that plaintiffs had suffered financial losses because of securities fraud, and the SOA statute of limitations is part of the remedy that Congress established to enable injured investors to file suit, deciding this case technically on the former statute of limitations rather than on the merits

dodges and obfuscates the appropriate inquiry-notice analysis.

With the clear remedial purpose behind the Congressional enactment of § 1658(b) to protect unwitting investors and to enable them to sue in federal court when they have suffered financial losses because of securities fraud, we remand this case to the district court for determining what constituted inquiry notice, when that occurred, and, following inquiry notice, the time required to file suit. Specifically, without the SEC Order, could plaintiffs have been alerted to Dean Witter's fraudulent conduct concerning their e-Net stock independently to enable them to file suit before issuance of the SEC order evidencing securities fraud by Dean Witter regarding plaintiffs' investments? The district judge must decide the point in time when inquiry notice occurred and the time necessary under reasonable-diligence analysis to file suit, the necessary, predicate factfinding for the legal decision of the timeliness of the class-action complaint in this case. Following these factual determinations by the district judge, we will be able to make the legal decision of whether the SOA statute of limitations in § 1658(b) applies to this case to permit it to proceed in district court.

Accordingly, at this preliminary stage of the proceedings with an undeveloped record, we remand this case to the district court to determine the essential, preliminary factual issues that we need to proceed with a legal

41

determination of the applicable statute of limitations:

> (1) What established inquiry notice to the plaintiff class, and when did that occur?

> (2) When did the plaintiff class have sufficient information to file suit?

These factual determinations by the district judge, particularly whether plaintiffs knew or could have known of Dean Witter's fraudulent conduct prior to the October 1, 2002, SEC Order, are critical and necessary to the legal determination of whether the class-action complaint filed on November 15, 2002, was time-barred. It would be premature and analytically inappropriate for us to decide the legal issue presented to us on interlocutory appeal on the basis of this pre-discovery, undeveloped, motion-to-dismiss record, when a factual determination concerning inquiry notice is first required.[18]

---

[18] We recognize that other circuits have decided that § 1658(b) cannot be applied retroactively to revive securities fraud cases, when the claims were time-barred under the former statute of limitations. See, e.g., Foss v. Bear, Stearns & Co., 394 F.3d 540 (7th Cir. 2005); In re Enterprise Mortgage Acceptance Co., 391 F.3d 401 (2d Cir. 2005). On the undeveloped record in this case, however, it is premature for us to make that legal determination. Under the inquiry-notice law of our circuit, we first must know the point in time when inquiry notice was applicable on the facts of this case. Once the district court has provided us with that factfinding, we can proceed to make the legal determination of the applicable statute of limitations. If the district judge determines that the plaintiff class was on inquiry notice prior to the effective date of the SOA statute of limitations, then this case is time-barred under the formerly applicable statute of limitations, 15 U.S.C. § 78i(e). In contrast, if the district judge determines that the SEC Order constitutes inquiry notice, then this class action for securities fraud is viable under § 1658(b). At this juncture, we do not yet know which statute of limitations applies to this case, necessitating our remand so that the district judge can make the factual determinations that we have directed, that relate to the essential fact of when inquiry notice occurred.

### III. CONCLUSION

This interlocutory appeal was for the purpose of our deciding whether the SOA statute of limitations in § 1658(b) is applicable to enable filing a securities fraud case that was time-barred under the prior statute of limitations. Under our circuit law, we need to know the point in time when the plaintiff class had sufficient inquiry notice to file the class-action complaint. The district judge needs to make this factfinding before we can proceed in deciding the legal issue of the applicability of § 1658(b) to this case. Therefore, the district court's order denying Dean Witter's motion to dismiss is **VACATED** and **REMANDED** for reconsideration in accordance with our analytical directions for the limited purpose of determining the date that the plaintiff class had sufficient factual information of their financial loses being the result of fraudulent conduct by Dean Witter to constitute inquiry notice to enable the class-action complaint to be filed in this case.

EDMONDSON, Chief Judge, concurs in the result.