[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2007
THOMAS K. KAHN
CLERK

_____

No. 03-12545

_____

D. C. Docket No. 02-02115-CV-T-26-EAJ

MARK TELLO,
on behalf of himself and all
others similarly situated,

Plaintiff-Appellee,

versus

DEAN WITTER REYNOLDS, INC.,
n.k.a. Morgan Stanley DW, Inc.,
PAUL GRANDE,

Defendants-Appellants,

MARK RODGERS,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 27, 2007)**

Before EDMONDSON, Chief Judge, BIRCH and FARRIS,[*] Circuit Judges.

BIRCH, Circuit Judge:

The interlocutory appeal in this class-action, securities-fraud case asks us to decide whether the amended statute of limitations in the Public Company Accounting Reform and Investor Protection Act of 2002, the Sarbanes-Oxley Act ("SOA"), 28 U.S.C. § 1658(b), revives securities-fraud actions that were time-barred before the effective date of the SOA. Following our determination that specific facts relating to inquiry notice were necessary for our decision, we returned this case to the district judge on limited remand. Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275 (11th Cir. 2005). After reviewing the facts concerning inquiry notice produced on limited remand, we conclude that this class-action, securities-fraud case was time-barred by both the former statute of limitations and the SOA statute of limitations, when it was filed. Accordingly, we reverse denial of defendants' motion to dismiss and remand for dismissal.

## I. BACKGROUND

A. Factual and Procedural History

This class-action, securities-fraud case concerns alleged conduct by Dean Witter Reynolds, Inc., currently known as Morgan Stanley DW, Inc., and its

---

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

former brokers Mark Rodgers and Paul Grande (collectively, "Dean Witter") regarding e-Net, Inc. stock for Internet telephone service from January 1, 1998, until August 19, 1998.[1] On October 1, 2002, the Securities and Exchange Commission ("SEC") issued an Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions ("SEC" Order) on Dean Witter, Rodgers, and Grande. The class-action complaint was filed on November 15, 2002, by then class representative E. Paul Roberts, who subsequently was replaced as class representative by Mark Tello. Tello, 410 F.3d at 1277 n.1.

Dean Witter moved to dismiss the complaint and argued that the SOA statute of limitations, which is two years from the date of discovery or five years from the date of the securities fraud, that became effective on July 30, 2002, does not control this case. 28 U.S.C. 1658(b). Instead, Dean Witter contended that the former statute of limitations governed, which required bringing an action within one year after discovery of the facts constituting the securities fraud or three years

---

[1] The short-squeeze that artificially inflated the e-Net stock price by Dean Witter, and Rodgers's unauthorized purchases of e-Net stock in accounts of his clients, including falsification of order tickets and false statements to his clients to discourage them from selling e-Net stock during the relevant time period that was the basis of the alleged securities fraud in this case, is described in our previous opinion. Tello, 410 F.3d at 1276-78.

after the violation. 15 U.S.C. § 78i(e). Although the original district judge determined that the SOA limitations period revives formerly time-barred claims and denied Dean Witter's motion to dismiss, he nonetheless permitted Dean Witter to seek appellate determination of this question.

On interlocutory appeal, we determined that our circuit law on inquiry notice required that we know whether the class had sufficient inquiry notice of the alleged securities fraud to have filed the class-action complaint before the effective date of the SOA. At the preliminary, motion-to-dismiss stage of the case, these facts had not been developed. Accordingly, on limited remand, we asked the reassigned district judge to provide the answers to two questions: "(1) What established inquiry notice to the plaintiff class, and when did that occur?" and "(2) When did the plaintiff class have sufficient information to file suit?" Tello, 410 F.3d at 1294.

B. Proceedings on Limited Remand

The district judge conducted a status conference and requested that the parties provide him with a joint stipulation of the time that they would need for the limited discovery required to answer our inquiry-notice questions. The parties stipulated that they would need ninety days to conduct limited discovery necessary to answer our questions and that this limited discovery would consist of an exchange of document requests and Tello's deposition. Thereafter, the district

4

judge entered an order scheduling limited discovery and briefs on the inquiry-notice issues to be addressed on limited remand to be followed by an evidentiary hearing and oral argument.

In the brief for the class with accompanying exhibits on remand, Tello's position is that there was no inquiry notice of Dean Witter's far-ranging scheme regarding e-Net stock until it was exposed and delineated in the SEC Order on October 1, 2002. He asserts that the class complaint was filed promptly within six weeks after the SEC Order issued. In contrast, Dean Witter's view, supported by its brief and exhibits, is that the precipitous drop in e-Net stock, combined with numerous articles in nationally and regionally distributed publications, addressing the abrupt decline in the price of e-Net stock, put the putative class on inquiry notice of the allegations in the complaint no later than August 14, 2000, the date that the last such nationally significant article was published. Consequently, the class was on notice well *before* the new SOA statute of limitations became effective on July 30, 2002, the former statute of limitations controls, and this case was time-barred under the prior, three-year repose statute. As we explain hereinafter, neither side is correct in stating the cause of inquiry notice from which to calculate the time required to file the class-action complaint.

The evidentiary hearing purportedly sought to resolve the two questions that

we posed to the district judge on limited remand: (1) what established inquiry notice for the plaintiff class and when? and (2) when did the class have sufficient information to file its class-action complaint? Accepting the time period for the alleged securities fraud conduct by Dean Witter as stated in the complaint, January 1, 1998, through August 19, 1998, the parties agree that the alleged fraud ended on August 19, 1998. Dean Witter presented evidence that three events established inquiry notice for the plaintiff class. First was the 80 percent drop in e-Net stock that occurred from August 18, 1998, to September 11, 1998, during which time "e-Net's CEO was issuing public statements saying nothing ha[d] changed about the company." Second Supp. R. at 17. Tello purchased 1,500 shares of e-Net stock on July 13, 1998, at $17 and 1/16 per share, and he purchased 1,000 shares of e-Net stock on July 15, 1998, at the same price. Tello Dep. at 42-44. As of July 1998, he had invested over $40,000 in e-Net stock, a substantial investment that Tello testified caused him to "check the price regularly." Id. at 44.

Second was the Washington Post article, "A 'Doonesbury' Imitation That's No Laughing Matter," which was published on September 14, 1998. Tello testified that "[t]his is the only article that I ever read about e-Net." Id. at 132. In conjunction with the dramatic drop in the price of e-Net stock, he asserted that this Washington Post article "made me think that the stock price took a nose dive. I

6

read this, and in my opinion, the whole world had read it and were running to sell their e-Net." Id. at 133. Recognizing that the signs of the collapse of e-Net stock were on the Internet from numerous postings and articles following the drastic drop in e-Net stock value, the Washington Post article explains that, while e-Net revenue rose 32 percent to $723,000, expenses rose 300 percent to $4,200,000. "Only in cyberspace and satiric cartoons did anyone argue that a start-up company could be worth 200 times its annual revenue." Jerry Knight, "A 'Doonesbury' Imitation That's No Laughing Matter," The Washington Post, Sept. 14, 1998. The company never made a profit. The price of e-Net stock plummeted from a high of $19 a share to $2.78 and 1/8 a share, which caused 85 percent of the investment of e-Net shareholders to evaporate and made e-Net a repetitive source of commentary on Internet investment bulletin boards. Such commentary, noted in the Washington Post article, included TheStreet.com,[2] which had warned that, with the

---

[2] TheStreet.com article, titled, "Entangled in e-Net," which is referenced in the Washington Post article, states in relevant part:

e-Net's (ETEL) longs and shorts are caught in a mess.

Shares of Internet telephony concern have slipped by more than 50% since they closed at 19 Aug. 17, but the longs may still be in for more pain, as e-Net has filed to sell 1.1 million shares in a secondary offering that will go effective shortly.

e-Net's share-price gyrations should serve as a cautionary tale for investors interested in betting on small-cap technology stocks. Despite minuscule revenues and a number of tough competitors, e-Net's stock almost tripled in a few months, seemingly more on speculation than on news—and then just as

mysteriously fell back sharply.

This little Germantown, Md.-based company reported just $723,000 in sales for its fiscal year ended March 1998 while ringing up losses of $3.9 million. Sales to three companies made up 82 of that revenue. Yet, <u>as recently as two weeks ago, the company boasted a market capitalization in excess of $154 million. That's 213 times revenue.</u>

Despite the hype surrounding Internet telephony last year, 2-year-old e-Net was a sleeper when it went public on Nasdaq in April 1997. In late March e-Net shares began to climb, nearly tripling to 18 3/8 from 6 ½ in late June. The shares then hovered around that level for almost five weeks in heavy trading, never once closing below 17, while the Nasdaq tumbled 7%. <u>In mid-August, after bumping briefly to a 20 intraday high, the stock began a slow nosedive.</u> On Tuesday[,] the company's shares skidded 1 1/8 to 9 ½, even as the stock market rallied.

Some investors who asked not to be named expressed concern that the run-up in e-Net's stock price this spring was unjustified. "I'm disconcerted at the recent stock activity," says one investor who is long the stock (and who would benefit if the stock price rose).

Two shorts (who would benefit if the stock price fell) and one long believe that a player, trading through market maker Morgan Stanley Dean Witter, amassed a large position and kept the stock above 17 for six weeks this summer. <u>Shares started their decline Aug. 19, the same day that shorts say Dean Witter stopped its buying pattern.</u> In prior weeks Dean Witter was a consistent buyer at 17, the three people say.

<u>This persistent buying helped push up the price and made the short-sellers sweat. Price fluctuation is unlikely to go away.</u> The short interest in the stock soared to about 719,100 shares as of Aug. 14—nearly 9% of outstanding stock, and more than double the level in mid-July.

<u>But e-Net, with a float of only 2.1 million shares, has the shorts hurting even as the price has fallen.</u> Two money managers who had been short e-Net say they recently were "brought in." A buy-in occurs if the lender demands its stock back, and cannot get shares elsewhere, forcing the short to "cover" by buying stock and returning it to the lender prematurely. The short might lose money or make less than intended.

"All said, I probably haven't made any money" as a result of the buy-ins, said one money manager recently, even though he had shorted the stock at 17.

8

stock value down to $9, "E-Net stock might tank when those freshly registered shares were unloaded." Id. Since e-Net "stock was sold privately and not registered with the Securities and Exchange Commission, it could not be traded and did not dilute the holdings of current investors." Id.

---

A spokesman for Morgan Stanley Dean Witter declined to comment on trading activity. A Securities and Exchange Commission spokesman declined to say whether the regulator is investigating e-Net trading. A Nasdaq official also declined to comment.

Of more immediate concern to investors is e-Net's plan to sell 1.1 million common shares, including 750,000 shares that were issued in a private placement in April, according to an amended document filed with the SEC Aug. 25. The rest is covered by warrants priced at between 8 and 9 and issued to the underwriters and placement agents. Holders will be able to sell when the registration goes effective, according to an SEC official familiar with the filing. The SEC declined to say when that might take place.

The added shares could weigh on a stock that already is feeling pressure.
. . . .
For a company whose losses are five times as large as sales, there are some questions regarding how e-Net compensated a part-owner and executive. According to a recent SEC document, the company paid legal fees of $380,000 to Thomas Prousalis, an attorney and 11% owner, for his work with the IPO in April 1997. Prousalis had already received $100,000 for an offering that was aborted in September 1996. The company originally intended to go public thorough Stratton Oakmont, which was expelled from the securities industry in late 1996 amid charges of bilking investors.

In addition, e-Net rented an airplane from a company owned by its CEO, Rob Veschi, paying $62,900 in the March fiscal year. Veschi takes home an annual salary of $175,000 along with a 50% bonus that "is not subject to any performance criteria."

Investors, on the other hand, should pay attention to performance. Or pay the price.

Kevin Petrie, Entangled in e-Net, TheStreet.com, Sept. 2, 1998 (emphasis added).

9

But on Aug. 25 E-Net disclosed in filings available on the Internet that it had registered those shares and two other batches, dumping an additional 1.125 million shares on the market.

. . . .

In fact, according to sources familiar with trading in the stock report, investors who held the newly issued stock already had cashed in their investment before the shares were even registered, when the stock was still trading in the high teens.

Selling unregistered stock is illegal, but what some investors are believed to have done was to get out in advance by short-selling—that is, borrowing stock from someone else and then selling it. Usually, short-sellers "cover" their positions and repay the stock loans by purchasing the stock later at a lower price. But in this case, they simply used the newly registered shares to repay the stock loans.

Sale of the new shares was the third strike for E-Net stockholders, who already had been whacked by the overall stock market decline and the severe tech stock correction.

Id. (emphasis added). Tello admitted that it would not be unreasonable for investors with considerable shares of e-Net stock to ascertain the meaning of a short squeeze through various articles and Internet postings referencing this term.[3] Id. at 146. While he did not consult any Internet articles or postings, Tello testified that he did not think it would be unreasonable after reading the Washington Post article for interested investors to locate articles on the Internet regarding e-Net. Id. at 136.

The Washington Post article on e-Net stock was referred to Tello by his

---

[3] Tello acquired Internet service after January 1997. Tello Dep. at 151. While five Internet postings have been addressed in this litigation, some 900 were available to those interested in researching e-Net stock. Second Supp. R. at 43.

stepfather, E. Paul Roberts, whom Tello succeeded as class representative, and who told Tello: "You should read that article. You need to read that article." Id. at 39. After reading the article, Tello testified as to his reaction: "It was not good about the company. It talked about how the company's valuation was—it was way overhauled and how they weren't making any money. It just wasn't a very good article." Id.

Importantly, Tello testified that the <u>Washington Post</u> article alerted him, as well as "everybody else," of the catastrophic problems with e-Net stock and Dean Witter's involvement:

> Q. <u>Is it also your understanding of the complaint that one of the ways in which Dean Witter and its employees allegedly manipulated the stock price of e-Net was by creating and promoting a plan to withhold from the short sellers a certain amount of stock to affect a short squeeze?</u> Is that your understanding of the complaint?
>     . . . .
> A. <u>Yes.</u>
> Q. <u>And is it your understanding that the short squeeze somehow manipulated the price of the e-Net stock?</u>
> A. <u>Yes.</u>
> Q. And do you have any evidence to believe that there was a short squeeze put in place with respect to e-Net?
> A. That's what the SEC order detailed.
> Q. <u>Have you seen anything else at any time that referenced a short squeeze in connection with e-Net?</u>
> A. No. <u>I read the</u> Washington Post <u>article in September of . . . 1998. And that was the only article that I read about the company until I then was presented with the case and the SEC order in 2003.</u> And <u>it was my understanding that it was due to that one Washington Post article that the whole stock just plummeted.</u>

11

Q. <u>What did you base that understanding on?</u>  Is that something you came to on your own conclusion or something that someone told you?
A. No, <u>something that I came to on my own, you know, justification. My stepfather told me about the article, I read it, and it just seemed like everybody else had read it and had sold their shares because the article scared them so much.</u>  And the dot-com industry was just going gangbusters, and it was, I guess, right around that time that the bubble started bursting.
        . . . .
Q. <u>Would [a June 21, 2000</u>, St. Petersburg Times <u>article concerning a similar experience with e-Net stock to that of Tello] have caused you to do any further fact-finding to look into why e-Net fell as much as it did while you owned it?</u>
A. <u>No.  Because I had already formed my opinion that it was because of the Washington Post news article.</u>

Tello Dep. at 55-56, 99 (emphasis added).  "Waiting for the inevitable bounce," <u>id.</u> at 133, however, Tello did not sell his e-Net stock until April 1999 for less than $4 a share, <u>id.</u> at 131.

The third source of inquiry notice proffered by Dean Witter is the article, "Borrower, Beware" published in <u>Fortune</u> magazine on August 14, 2000.  At the evidentiary hearing, counsel for Dean Witter explained that this article was important because it specifically discusses Dean Witter and Mark Rodgers as well as the allegations of unauthorized trading in e-Net stock, breach of fiduciary duty, and Dean Witter's settlement of the claim for $531,000.[4]  Dean Witter's counsel

---

[4] Using various investors who had lost their retirement savings through investments involving margins, the article is revealing and chilling.  One of the investors, David Spaulding, a sixty-year-old captain of three charter fishing boats, explains how he asked Dean Witter broker Mark Rodgers in Clearwater, Florida, to manage his retirement portfolio that was valued at over

specified the significance of the Fortune article to this class action and as the third factor constituting inquiry notice:

> Why that reference to unauthorized trading is important is because, as alleged in the lawsuit here, unauthorized trading doesn't just hurt the person in whose account it supposedly took place.  As the Plaintiff[]s allege here, unauthorized trading[,] especially in a thinly traded stock like e-Net[,] can be a tool that is used to create demand for a stock, and manipulate the price of the stock.
> So it is our position that these three events taken together, the dramatic decline in price [of e-Net stock], the Washington Post article, and the Fortune article, that is what established inquiry notice.  That is what gave a reasonably objective investor enough notice to at least begin investigating the possibility that his rights ha[d] been infringed.

Second Supp. R. at 19-20 (emphasis added).

Significantly, Tello knew Edward Ratkovich, a longtime friend of Tello's stepfather, Roberts, the original plaintiff and class representative in this case. Ratkovich was the second largest stockholder of e-Net stock, and he asked Tello to replace his stepfather as the class representative in March 2003.  The same counsel

---

$900,000 at the end of 1997.  In June 1998, Rodgers bought $150,000 of e-Net stock, and, over the next two months, continued purchasing e-Net until it was half of Spaulding's portfolio. Spaulding contends that the e-Net trades were unauthorized and that he asked Rodgers to get out of the margin immediately.  Ultimately, Spaulding lost his entire retirement savings, nearly $1,000,000, he had to sell the rest of his portfolio to meet the margin calls, and he still owed Prudential over $400,000 for his margin debt.  Spalding, who went from being secure to being in the hole in a few short weeks, filed a complaint against Dean Witter and Rodgers with NASD Regulation, which included breach of fiduciary duty and unauthorized trading.  Dean Witter settled with Spaulding for $531,000.  Rodgers and Prudential opted for arbitration; Spaulding was awarded $380,000, but $275,000 was deducted to reimburse Prudential for its outstanding margin debt.  Margaret Boitano, "Borrower, Beware," 142 Fortune 132, Aug. 14, 2000.

who represents Tello in this case represented Ratkovich in a complaint filed in May 1999 against Dean Witter and Mark Rodgers, the details of which are discussed in a May 16, 1999, article in the St. Petersburg Times.[5]

Ratkovich and others, who pursued arbitration proceedings, had the same allegations of securities fraud against Dean Witter that Tello makes for the class in this case. These legal proceedings against Dean Witter plus the various articles not only in national publications, like the Washington Post and Fortune, but also in regional Florida newspapers, led Dean Witter's counsel to argue at the evidentiary hearing:

> [W]hether Mr. Tello chose to read all of these sources or not, I submit, is immaterial. Once you are on a reasonable duty of inquiry, you are charged with knowledge of these. If you don't look at them, they are going to be imputed to you.
> The reasonable investigation on that date also would have led an investor to no fewer than seven articles referencing the price decline, and no fewer than five articles referencing the short squeeze and misstatements designed to discourage people from selling. All of that is part of the Complaint.
> . . . [W]e believe the answer to the Eleventh Circuit's second question should be that the putative class upon a reasonably diligent investigation could have had access to sufficient information to file a suit no later than August 14, 2000.

Second Supp. R. at 31 (emphasis added). In contrast, Tello's counsel maintained

---

[5] Dean Witter's counsel explained at the evidentiary hearing that "the market manipulation allegation in the Ratkovich case really speaks volumes" as to information that was available on the same allegations regarding Dean Witter's conduct concerning e-Net stock long before the class action complaint was filed in this case. Second Supp. R. at 75.

14

that the SEC order was the operative date of inquiry notice, "the defining moment in history when a reasonable investor should have been on both inquiry notice, and had facts sufficient to bring a claim." Id. at 51.

Following the evidentiary hearing, the district judge issued a five-page order, a copy of which is attached as the Appendix to this opinion. The judge states that, in compliance with his discovery order on our limited remand,

> the parties submitted memoranda accompanied by thirty-two exhibits comprising hundreds of pages of deposition, newspaper and magazine stories, business journal articles, online message-board postings, newspaper and magazine circulation data, annual corporate reports, and pertinent stock transactions—all of which the parties supplemented at the [evidentiary] hearing by two hours of vigorous oral argument. Neither party elected to present testimony at the hearing.

1 First Supp. R. 65 at 2 n.1.

With the substantial evidence produced on limited remand, the district judge failed to delineate in his order any process that he used to analyze when inquiry notice occurred for the class and when there was sufficient information to file the class-action complaint, the two questions that we remanded the case for him to answer. Instead, he conclusively stated:

> After affording the parties a full hearing on the inquiry notice question, the district court finds no such moment [when the plaintiff class was on inquiry notice of the alleged securities fraud by Dean Witter relative to e-Net stock]. Unsurprisingly, the plaintiffs' theory places inquiry notice on October 1, 2002, after the effective date of

15

Sarbanes-Oxley (Doc. 60). Equally unsurprisingly, the defendants' theory places inquiry notice on or before August 14, 2000 (Doc. 58). (Of course, the statute of repose barred the plaintiffs' action on August 20, 2001, irrespective of inquiry notice). The parties' irreconcilable versions of the pertinent history present genuine issues of material fact resolvable only by a jury.

Id. at 3-4 (footnote omitted). Then, "irrespective of inquiry notice," the judge proceeded to analyze the legal question before us on interlocutory appeal concerning whether the SOA revives time-barred cases. Id. at 4. Therefore, we must decide if the testimony and evidence produced by the parties on limited remand in the district court resolve the inquiry-notice issues that we need answered before deciding the question presented to us on interlocutory appeal, which involves determining which statute of limitations governs in this case.

## II. DISCUSSION

A. Consideration of Facts Before the District Court

When this court remands a case to a district court with specific factual questions to resolve, we expect the district judge to answer those questions. Because of our circuit law on inquiry notice, which includes factual determinations, we are unable to answer the interlocutory question on appeal until we know which statute of limitations controls in this case. The former statute of limitations for securities fraud actions was "within one year after the discovery of the facts constituting the violation and within three years after such violation." 15

16

U.S.C. § 78i(e); <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 364 & n.9, 111 S.Ct. 2773, 2782 & n.9 (1991). The remedial SOA statute of limitations is "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). To comply with our circuit inquiry-notice requirements, we asked the district judge on limited remand to make the factual determinations necessary for our legal decision on interlocutory appeal and to tell us: "(1) What established inquiry notice to the plaintiff class, and when did that occur?" and "(2) When did the plaintiff class have sufficient information to file suit?" <u>Tello</u>, 410 F.2d at 1294.

Although the parties produced the documentation necessary to answer these questions, including the revealing deposition of Tello, the district judge has given us no indication that he reviewed and analyzed the considerable documents produced on limited remand. Instead, he first characterizes our limited remand from an interlocutory appeal from a motion to dismiss as "an unusual event."[6] 1

---

[6] Because we are not factfinders, when we need facts to resolve legal questions before us, we return the case to the district court on limited remand for the requisite factfinding or determination of specific factual issues. <u>See, e.g.</u>, <u>Callahan v. Campbell</u>, 427 F.3d 897, 924 (11th Cir. 2005) (limited remand to determine unaddressed claims had been ordered in habeas corpus case); <u>Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.</u>, 374 F.3d 1020, 1023 (11th Cir. 2001) (per curiam) (limited remand for determination of citizenships of the parties); <u>Williams v. Best Buy Co.</u>, 269 F.3d 1316, 1321 (11th Cir. 2001) (limited remand to develop the record and make factual findings concerning the amount in controversy at the time of removal); <u>O'Neal v. United States</u>, 258 F.3d 1265, 1270, 1277 (11th Cir. 2001) (limited remand with instructions to recalculate the interest deduction at the conclusion of estate-tax case); <u>Lucero v. Trosch</u>, 121 F.3d 591, 595 (11th Cir. 1997) (limited remand had been ordered to conduct an

17

First Supp. R. 65 at 2. Second, the judge simply recited the dates that the parties

considered to be operative for inquiry notice: for the class, October 1, 2002, the

date of issuance of the SEC Order; for Dean Witter, August 14, 2000, the date of

publication of the Fortune article, describing specifically Dean Witter's securities

fraud. The judge did not address whatsoever the documents that the parties

presented to substantiate those two dates. Consequently, the judge announced that

he could not determine inquiry notice, apparently based only on the evidentiary

hearing. Third, seemingly ignoring the inquiry-notice issue that we sent to him for

resolution, the district judge proceeded to address the statute-of-limitations issue

before us on interlocutory appeal. The comments of the district judge and his

failure to provide the answers to factual questions that we needed to resolve the

threshold issue of inquiry notice before we can make the legal statute-of-

limitations determination were unhelpful and judicially inefficient by declining to

inquiry as to whether injunctive relief was moot regarding operator of abortion clinic); James v.
Singletary, 995 F.2d 187, 187 (11th Cir. 1993) (per curiam) (limited remand to determine
competence to stand trial had been ordered in habeas corpus case); Atlantic States Legal Found.
v. Tyson Foods, Inc., 897 F.2d 1128, 1143 (11th Cir. 1990) (limited remand for 120 days to
calculate penalties for environmental pollution of poultry processing plant and reasonable
attorney's fees, including evidence form both sides as to number of violations, expense of
compliance with federal law, and increased economic gain from noncompliance). Indeed, the
former Fifth Circuit issued a limited remand in a case pursuant to a petition for rehearing for the
district judge to determine if the operative one-year statute of limitations controlled. Equal
Employment Opportunity Comm'n v. Griffin Wheel Co., 521 F.2d 223, 225 (5th Cir. 1975) (per
curiam). Limited remands at various litigation stages clearly are not "unusual." 1 First Supp. R.
65 at 2.

18

follow our specific instructions on limited remand.

"Many times, and in many contexts, this Court has admonished district courts that their orders should contain sufficient explanations of their rulings so as to provide this Court with an opportunity to engage in meaningful appellate review." Danley v. Allen, 480 F.3d 1090, 1091 (11th Cir. 2007) (per curiam) (including cases cited in this interlocutory appeal from a motion to dismiss and remand for factfinding and legal analysis to substantiate the ruling). Because the documents produced by the parties clearly resolve the inquiry-notice issues that we wanted resolved by the district judge and because these documents were before the district judge in the first instance pursuant to his order, albeit with no apparent review, we have considered them and find the answers to our questions on limited remand to be obvious.[7] From the perspective of judicial efficiency, and because the answers to our inquiry-notice questions are abundantly evident from the testimony and documents produced by the parties on limited remand, we now use

_____

[7] If the answers to our questions had not been so plain from the testimony and evidence produced on limited remand, we would have remanded for a possible bifurcated trial for a jury to determine the facts necessary for the inquiry-notice determination presented to us on interlocutory appeal, potentially before another judge. See Kennedy v. Tallant, 710 F.2d 711, 716 (11th Cir. 1983) (advisory jury in class action determined whether plaintiff filed the case within two years of the securities fraud using due diligence to compute applicability of the statute of limitations); see also United States v. Martin, 455 F.3d 1227, 1242 (11th Cir. 2006) (judicial reassignment); United States v. Torkington, 874 F.2d 1441, 1447 (11th Cir. 1989) (per curiam) (same). While that process may be necessary in future cases, it is not required in this case, where the testimony and documentation are so clear that such a procedure would have been judicially inefficient.

19

them to resolve the inquiry-notice issues so that we can proceed to decide the statute-of-limitations issue that has been presented to us on interlocutory appeal.[8]

B. Inquiry Notice

In our previous opinion, we discussed inquiry notice in our circuit in detail, which is significant for determining when knowledge of a potential securities fraud occurred, and the determination of how much time would be needed to file a complaint. Tello, 410 F.3d at 1283-88. While we know that the class action complaint in this case was filed on November 15, 2002, which ostensibly would place it under the SOA statute of limitations, we did not know from the record at the motion-to-dismiss stage whether the plaintiff class had sufficient inquiry notice and information to have filed the class-action complaint sooner and whether such an earlier date would have placed the class under the former statute of limitations. This was the purpose for our limited remand.

---

[8] The district judge quotes from our prior opinion that "'[w]hether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" 1 First Supp. R. 65 at 3 n.2 (quoting Tello, 410 F.3d at 1284) (emphasis added). "Often," however, is not "always," and this is plainly a case where limited discovery on inquiry notice makes the legal issue presented to us on interlocutory appeal dispositive without full discovery. Rather than expressing his disagreement with our remand to him for limited, specific factfinding, the district judge could have helped us greatly by reviewing the documentary evidence produced by the parties, which demonstrated that they understood the limited facts that we needed to resolve the statute-of-limitations question before us on interlocutory appeal. We appreciate their assistance. Instead, the district judge elected to state his own view of how the case should be resolved legally.

Inquiry notice in our circuit occurs when there is factual evidence of the *possibility* of securities fraud that would cause a reasonable person to investigate whether his or her legal rights had been infringed. Id. at 1283. Actual proof of securities fraud is not required for inquiry notice. Id. "[S]torm warnings" are circumstances creating a duty of inquiry, such that an investor who acquires knowledge of storm warnings and does not investigate whether a securities fraud had occurred will have the available knowledge imputed to him or her. Id. Once inquiry notice occurs, a prospective plaintiff enters a period of reasonable diligence, which is the time necessary, exercising ordinary investigation, to ascertain sufficient facts to file a complaint. Id. Remedial securities laws for combating fraud, such as the SOA, are enacted with the recognition that many securities frauds are inherently complex and, allowing time to develop the facts, is judicially efficient. Id. at 1285-88.

We concluded our inquiry-notice analysis by explaining that "the task for the district judge on remand will be to determine the point in time when the plaintiff class had sufficient information of the alleged fraudulent securities conduct by Dean Witter to file this class action." Id. at 1288. We stated the two questions that we wanted answered on limited remand: "(1) What established inquiry notice to the plaintiff class, and when did that occur?" and "(2) When did the plaintiff class

21

have sufficient information to file suit?" Id. at 1294. Because the district judge

answered neither question, we proceed to answer each based on the testimony and

documentation produced by the parties on limited remand to the district judge.[9]

---

[9] From his comments at the evidentiary hearing, the district judge appears to have been annoyed with the limited remand in this case and did not undertake to analyze it in terms of our inquiry-notice law. The parties, however, understood what we had requested as the exchange between the district judge and Dean Witter's counsel shows:

> COUNSEL: I think we should go forward on limited discovery on the limited inquiry issue . . . .
> I suppose there is a way where there is not a question of fact. The way I can see that is, all of the evidence we are relying on comes from the public record. Newspaper articles, pleadings, complaints comes from the public record in terms of inquiry notice.
> THE COURT: Do you mean to say you think it may not be a subject of dispute, or there may be no genuine issue?
> COUNSEL: It may not be a genuine issue [of] fact . . . . [T]he facts are what they are, and the test is not whether this is a particular investor who knew or should have had inquiry notice, but whether a reasonable, objective person based on that undisputed set of facts would have had inquiry notice.
> I think that is something Your Honor could resolve, and make a finding to the Eleventh Circuit. They then could decide, based on Your Honor's findings, whether the claim is time-barred, whether it has been revived, whether the old statute of limitations applies or the Sarbanes-Oxley . . . .
> THE COURT: That there may be no genuine issue?
> COUNSEL: I think the public record is what it is. I think the test is whether a reasonable person faced with that record would have [had] inquiry knowledge.

2 First Supp. R. at 16-17 (emphasis added).
Following limited discovery, Dean Witter's counsel again explained to the district judge at the evidentiary hearing the factual determinations that we expected him to make on limited remand:

> I think [the Eleventh Circuit is] asking you to determine whether you can say based on the record evidence as a matter of law that inquiry notice occurred before the Sarbanes-Oxley Act, and if so when.
> I think you can make that determination. I will walk you through the reasons why. They did leave open the possibility that Your Honor may not be able to find that as a matter of law. You may find that there is a fact question here.

22

---

Again, <u>I think based on the record evidence, and the standard that applies,</u> <u>including the reasonable objective person standard, Your Honor can make a</u> <u>decision as to when the putative class was on inquiry notice.</u>

Second Supp. R. at 12-13 (emphasis added).

23

C. Establishment of Inquiry Notice

Dean Witter asserts that three events collectively establish inquiry notice: (1) the 80 percent drop in e-Net stock that occurred from August 18, 1998, to September 11, 1998, (2) the Washington Post article, and (3) the Fortune magazine article. Since the last of the publications, the Fortune article, was published on August 14, 2000, that is the date by which Dean Witter contends that inquiry notice was established for the purpose of assessing the running of the statute of limitations. We address each of these occurrences as to establishing inquiry notice in our circuit.

First, we have rejected a sharp decline in stock value as indicating securities fraud, which would constitute inquiry notice. La Grasta v. First Union Secs., Inc., 358 F.3d 840, 846-48 (11th Cir. 2004). "There may be numerous reasons, other than fraud, for a stock to decline (even steeply) in price." Id. at 847. Such reasons include "'a depressed real estate market caused either by tight money or recession,'" stock volatility, poor management, or general market conditions.[10] Id.

_____

[10] As we have recognized,

> to state the obvious, the stock market—where risk is inherent—is not a place for those who are faint of heart or weak of stomach. Individuals who put their money in equities in the hope of garnering great returns do not have the peace of mind provided by FDIC insurance, and must be willing to live with fluctuations in the value of their investments.

24

at 846-47 (quoting <u>Summer v. Land & Leisure, Inc.</u>, 664 F.2d 965, 969 (5th Cir. Unit B 1981)). Significantly, this was a period of time when the "dot com" technology companies were highly volatile. The plunging price of e-Net stock, however, did not cause Tello to sell his stock. Instead, he delayed seven months, until April 1999, "[wa]iting for the inevitable bounce."[11] Tello Dep. at 133. Accordingly, inquiry notice was not caused by the drastic decline in value of e-Net stock.

In contrast, Tello read the <u>Washington Post</u> article within a week of its publication on September 14, 1998, on the advice of his stepfather, Roberts, who also owned e-Net stock. Regarding his reaction to the article, Tello testified:

> <u>In my mind, the stock price plummeted because the writer of [the Washington Post] article . . . let the cat out of the bag, and people rushed to sell [their e-Net stock].</u>
>         . . . .
>  <u>This is the only article that I ever read about e-Net. This is it</u>.
>         . . . .
>  <u>[T]his is the one that caused—that made me think that the stock price took a nose dive. I read this, and in my opinion, the whole world had read it and were running to sell their e-Net.</u>

Tello Dep. at 41, 132, 133 (emphasis added). The article notes that e-Net "became a favorite on Internet investment bulletin boards. Yahoo alone lists some 900

---

<u>La Grasta</u>, 358 F.3d at 847.

[11] Tello testified that Roberts, his stepfather and predecessor as class representative, told him that e-Net "would bounce back up after it went down." Tello Dep. at 41.

25

postings about e-Net stock, most of them apparently from amateur investors taken with the company's technology and lure of free long-distance calls." Jerry Knight, "A 'Doonesbury' Imitation That's No Laughing Matter," Washington Post, Sept. 14, 1998. While Tello did not consult the Internet bulletin boards referenced in the Washington Post article, he admitted that it would not be "unreasonable" for an interested reader to review the Internet bulletin boards after reading the article. Tello Dep. at 136.

Inquiry notice for determining statute-of-limitations compliance is gauged by the knowledge of the alleged securities fraud by the class representative. Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002). Inquiry notice occurs when the representative learns "'facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed'"; the "'*possibility* of fraud'" is all that is required for inquiry notice, "'not full exposition of the scam itself.'" Id. (quoting Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001)). Tello testified that he learned of the apparent securities fraud by Dean Witter relating to e-Net stock from the Washington Post article that his stepfather, Roberts, the preceding class representative and e-Net investor, told him to read. Allowing for time to read the article, which, according to Tello, was not the day of publication, but approximately a week later, inquiry notice was established at least

26

by the end of September 1998.

The Washington Post article describes the short squeeze utilized by Dean Witter as to e-Net stock. As he testified, Tello's reaction to the article was that it was enough to scare investors into selling their e-Net stock. Additionally, the article references Internet sites, such as TheStreet.com, where a concerned e-Net investor could have acquired a substantial amount of information, as well as the availability of Internet searches that would have located numerous articles about Dean Witter's short squeeze conduct as to e-Net stock in September 1998. Such searches also would have revealed various arbitrations concerning e-Net. "With the advent of the 'information superhighway,'" information regarding securities is "easily accessed" and "[a] reasonable investor is presumed to have information available in the public domain" and will be "imputed with constructive knowledge of this information." Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 (7th Cir. 1995).

While determination of inquiry notice is done on a case-by-case basis using our caselaw guidance, it is clear that the Washington Post article was inquiry notice in this case for Tello, as he asserts repeatedly in his deposition. It is inconsistent with the law of our circuit and Tello's testimony for him to argue that inquiry notice did not occur until the October 1, 2002, SEC Order, which was actual

knowledge. Full revelation of the securities fraud is not required for inquiry notice, only notice of the *possibility of fraud*, which signals the need for the class representative to commence sufficient investigation to file a complaint. Therefore, inquiry notice is distinguished from actual knowledge or knowledge following full discovery. After reading the Washington Post article in September 1998, Roberts, the original class representative, and Tello had ample information to constitute inquiry notice to have commenced the research necessary to file a class action case within a year of that inquiry notice under the former statute of limitations.[12] The testimony and evidence produced during limited remand shows an abundance of information about Dean Witter's conduct regarding e-Net stock was available with a simple Internet search.[13]

Importantly, however, Tello's deposition, shows that the Washington Post article was sufficient inquiry notice for both Roberts and Tello. "Inquiry notice in our circuit as to securities fraud occurs when a potential plaintiff discovers facts

---

[12] Indeed, Roberts's longtime friendship with Ratkovich, the second largest stockholder of e-Net stock, who filed his substantially similar case concerning e-Net stock in May 1999, further alerted Roberts and Tello to Dean Witter's short squeeze relative to e-Net stock and gave them additional direct knowledge of the situation.

[13] While other articles and Internet sources independently may not have provided inquiry notice, Tello's deposition testimony shows that, after reading the nationally circulated Washington Post article, simple Internet searches would have revealed them. Consequently, in the context of this case, they were available to him; therefore, knowledge of them is imputed to Tello.

28

evidencing securities fraud." <u>Tello</u>, 410 F.3d at 1289 (citing <u>Theoharous</u>, 256 F.3d at 1228). It is irrelevant that Tello replaced Roberts as the class representative in April 2003 or that Rodgers was not Tello's broker, because he is held to the knowledge that he and Roberts had in September 1998 from the <u>Washington Post</u> article, the only article that Tello testified that he read about the rapid fall of e-Net stock, after Roberts referred it to him.[14] Additionally, because they were aware from the <u>Washington Post</u> article that specified the short squeeze that Dean Witter had used with e-Net stock, knowledge of the other readily available articles concerning e-Net stock was imputed to Roberts and Tello. Therefore, inquiry notice was established by the end of September 1998 following the publication of the <u>Washington Post</u> article, which is the answer to the first question that we asked

---

[14] Tello testified that he did not read the <u>Fortune</u> article that Dean Witter contends is the date of inquiry notice, August 14, 2000, and he is clear in his deposition that the <u>Washington Post</u> article regarding Dean Witter's short squeeze is the only article that he read concerning e-Net's stock-valuation plummet. The <u>Washington Post</u> article concerned Tello enough that he determined to sell his e-Net stock, although he retained it for seven months hoping for a rebound. Accordingly, we need not address the <u>Fortune</u> article as to inquiry notice for Tello, because his deposition testimony makes clear that the <u>Washington Post</u> article was the source of inquiry notice for Roberts and him, and it was published well before the <u>Fortune</u> article. Nonetheless, we note from the documentation produced on limited remand that both the <u>Washington Post</u>, viewed as a national newspaper, and nationally distributed <u>Fortune</u> magazine have more subscriptions than <u>Smart Money</u> magazine, which had an article concerning a securities fraud that we found to be the basis for inquiry notice in a class-action, securities-fraud case. <u>La Grasta</u>, 358 F.3d at 846. Additionally, we upheld the finding in district court that reading a newspaper article published in the <u>Atlanta Journal</u> provided inquiry notice in a class-action, securities-fraud case. <u>Kennedy</u>, 710 F.2d at 714, 716.

29

the district judge to determine on limited remand.[15]

D. Timeliness of Filing Suit

With inquiry notice established as of September 1998, we next asked the district judge to determine when the plaintiff class would have acquired sufficient information to file suit. Tello, 410 F.3d at 1294. Dean Witter has produced a plethora of articles about the plummet in the price of e-Net stock that were available from 1998 through 2000 to interested investors. The Washington Post article notes that 900 postings regarding the sharp drop in e-Net stock value could have been located through the Internet on Yahoo alone. Significantly, Tello testified that he and Roberts knew from the Washington Post article that Dean Witter's short squeeze as to e-Net stock was the reason for the drastic drop in its value. The Washington Post article also referenced other articles, such as the Internet article on TheStreet.com, which addressed the e-Net securities fraud in more detail. Prior to 2000, "there w[ere] 13 lawsuits, arbitrations, filed against

_____

[15] The district judge did not respond to our question. Instead, he stated in his order: "After affording the parties a full hearing on the inquiry notice question, the district court finds no such moment [for inquiry notice.]" 1 First Supp. R. 65 at 3. We did not ask the district judge to determine a single moment in time for inquiry notice. Publications are not necessarily read by a class representative on the day of publication. We, however, did ask the district judge to determine what established inquiry notice and generally when that occurred. From Tello's deposition, clearly the Washington Post article constituted inquiry notice, and Tello read the article in September 1998. The district judge had the facts concerning inquiry notice plainly before him following the limited discovery that he ordered on remand, yet he apparently declined reviewing Tello's deposition or the other documentary evidence that clearly would have answered the questions that we posed to him on limited remand.

30

Dean Witter and Mr. Rodgers alleging fraud, unauthorized trading, and violations of the securities laws." Second Supp. R. at 32. These actions regarding e-Net stock were proceeding in 1998 and 1999. Yet, Roberts waited until November 15, 2002, before filing this class-action case.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). By giving a defendant notice of the plaintiff's claim and the basis for it, "[t]his simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz v. Sorema, 534 U.S. 506, 512, 122 S.Ct. 992, 998 (2002); see In re Southeast Banking Corp., 69 F.3d 1539, 1551 (11th Cir. 1995) ("'Neither "notice pleading" requirements (Fed.R.Civ.P. 8(a)(2)) nor the standards which govern dismissals under Rule 12(b)(6) require a claimant to set out in detail the facts upon which he bases his claim.'" (citations omitted)). Consequently, Roberts, whose knowledge inures to Tello, who replaced him as class representative, could have acquired sufficient information for federal notice pleading to have filed a class-action complaint within a year, assessed from inquiry notice in September 1998, after the Washington Post article was published. Other similar actions concerning Dean

31

Witter's conduct with respect to e-Net stock had been based on sufficient information to proceed before 2000, and Ratkovich's case concerning his e-Net stock was filed on May 16, 1999, by the same counsel representing Tello in this case.[16] Moreover, Roberts and Tello, because of their friendship with Ratkovich, the second largest shareholder of e-Net stock, had specific knowledge through him and his similar e-Net lawsuit concerning Dean Witter's short squeeze as to e-Net stock.

The former statute of limitations for federal securities actions provided that a

---

[16] At the evidentiary hearing, Dean Witter's counsel noted that the 13 similar e-Net arbitration cases had proceeded *before* the publication of the Fortune article on August 14, 2000:

> In other words, these 13 people had enough information to make allegations very similar to the allegations being made here. Now, I am not saying every investor should have known about these 13 arbitrations, but I am saying that these 13 arbitrations go to prove that there was enough information out there before August 14, 2000 to allow the filing of a Complaint with these kinds of allegations.
> In fact, Your Honor, the Plaintiff's counsel in this case as early as May 16, 1999, more than one year before I am arguing for, filed a complaint against Dean Witter and Mark Rodgers on behalf of a gentleman called Edward Ratkovich, who is identified in the May 16, 1999 St. Petersburg Times article as the, "Second largest shareholder of e-Net."
> . . . .
> So as of May 16, 1999, there was enough information publically available to make a charge of unauthorized trading for the purpose of market manipulation in e-Net. That is what this claim is all about. I am talking about August 14, 2000. This [filing of Ratkovich's lawsuit] occurred on May 16, 1999.
> I think the fact that Mr. Ratkovich was in a position to make those allegations in May of 1999 supports our position that there was sufficient information in the public as of August 14, 2000.

Second Supp. R. at 32-33 (emphasis added).

case must be "brought within one year after discovery of the facts constituting the violation and within three years of the violation." 15 U.S.C. § 78i(e). The undisputed time period for the securities fraud at issue in this case was from January 1, 1998, until August 19, 1998. Following the Washington Post article about e-Net stock in September 1998, Roberts had sufficient time within a year, or by September 1999, to have filed this case on behalf of the plaintiff class under federal notice pleading. With all the information that was available as to e-Net stock, which was imputed to him, whether he read it or not, he likely had more knowledge of Dean Witter's alleged securities fraud than is required by the minimal amount of knowledge for federal notice pleading, which relies on discovery to supply specific details of a particular securities fraud.

With regard to time needed to file this case, we asked the district judge: "Specifically, without the SEC Order, could plaintiffs have been alerted to Dean Witter's fraudulent conduct concerning e-Net stock independently to enable them to file suit before issuance of the SEC order evidencing securities fraud by Dean Witter regarding plaintiffs' investments?" Tello, 410 F.3d at 1294. Had the judge reviewed Tello's deposition, and thereby known that the Washington Post article provided inquiry notice, the answer would have been "Yes," as we have explained based on the evidence produced on limited remand. Similarly, review of the

33

evidence produced on limited remand, particularly Tello's deposition, would have shown that the class-action complaint could have been filed within the former statute of limitations, after inquiry notice was established by the end of September 1998.

E. Statute-of-Limitations Determination

On interlocutory appeal, we essentially were asked to decide whether the former statute of limitations, with a one-year/three-year scheme, or the SOA statute of limitations, with a two-year/five-year scheme, governs this case. The collective defendants, Dean Witter, had the burden of proving the affirmative defense of a statute-of-limitations bar. Tello, 410 F.3d at 1292. This class-action, securities-fraud case was not filed until November 15, 2002, which generally would make the SOA statute of limitations applicable, since it applies to cases filed after its effective date of July 30, 2002. Nevertheless, the parties do not dispute that the short squeeze, securities fraud at issue in this case ended on August 19, 1998. The Washington Post article that provided inquiry notice was published in September 1998, and it is clear from Tello's deposition that this article constituted inquiry notice for Roberts and Tello as the successive class representatives.[17] The SEC

---

[17] We additionally have held that "'a class representative whose claim is time-barred cannot assert the claim on behalf of the class.'" Franze, 296 F3d at 1254 (quoting Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1347 (11th Cir. 2001)). It is regrettable that Roberts and Tello, the successive class representatives, delayed until November 15, 2002, before filing suit

Order is not the result of a judicial proceeding, and, while it would have provided supplementary evidence during discovery had the case been filed timely under the former statute of limitations, there was abundant information to have filed the class action and to have conducted full discovery without it.

Both the former statute of limitations and the SOA statute of limitations have an inquiry-notice provision: "one year after the discovery of the facts constituting the violation," 15 U.S.C. § 78i(e), and "2 years after discovery of the facts constituting the violation," 28 U.S.C. § 1658(b)(1). Dean Witter's alleged securities fraud concerning e-Net stock undisputedly ended in August 1998. Since the Washington Post article that established inquiry notice to Roberts and Tello was published in September 1998, this class action could have been filed under federal notice pleading within one year, or by September 1999, which also was

_____

on behalf of the class that had purchased e-Net stock. Because there was so much exposure of the Dean Witter's alleged securities fraud concerning e-Net stock relatively soon after it occurred, this is not the kind of case for which the remedial SOA was intended, cases where the securities fraud could not have been discovered until after the former statute of limitations had expired. Roberts and Tello, who were knowledgeable investors, had inquiry notice concerning e-Net stock from the Washington Post article in September 1998, and their friendship with Ratkovich, the second largest shareholder of e-Net stock, who recruited Tello to be Roberts's successor as class representative and filed his own case in May 1999, provided additional, specific information concerning Dean Witter's short squeeze with respect to e-Net stock. Given the law of our circuit regarding inquiry notice and the available storm warnings concerning e-Net stock, the delay in filing this class action cannot overcome the former, operative statute of limitations. Consequently, a class of investors, who lost substantial money and savings because of their purchase of e-Net stock and Dean Witter's short-squeeze conduct and who were relying on their successive class representatives to handle this class action for them, have been time-barred in their securities-fraud case and deprived of potential recovery.

"within three years after such violation." 15 U.S.C. § 78i(e). Consequently, it was untimely when it was filed on November 15, 2002, under the former statute of limitations. Although the SOA statute of limitations extends the time period within which the class-action complaint could have been filed under inquiry notice by one year, or until September 2000, the class-action complaint also was untimely under inquiry-notice analysis when it was filed on November 15, 2002. Because of the September 1998 inquiry notice established by the Washington Post article, revealed by Tello's deposition, he cannot rely on the SOA repose period of five years from the violation, since the statute provides that the "earlier of" the two time periods controls. 28 U.S.C. § 1658(b).

After reviewing the remedial nature of modified, extended statutes of limitations in our first opinion, we recognized "[f]rom analogous Supreme Court and circuit precedent" that the "temporal reach [of § 1658(b)] inherently includes securities fraud that occurred prior to the date of enactment." Tello, 410 F.3d at 1282. Nonetheless, we concluded that "§ 1658(b) is applicable to the alleged fraudulent securities conduct in this case, *provided inquiry notice was not sufficiently established to enable the plaintiff class to file this class action prior to the issuance of the SEC Order.*" Id. at 1282-83 (emphasis added). As the testimony and evidence produced on limited remand revealed, inquiry notice was

36

established in September 1998 by the <u>Washington Post</u> article. Because Tello and the class are time-barred under both the former statute of limitations and the SOA statute of limitations, the question of whether the SOA statute of limitations revives securities-fraud actions that were time-barred under the former statute of limitations is not presented in this case, as our inquiry-notice analysis has shown. Therefore, as we have explained, this class-action, securities-fraud case was time-barred by both the former and SOA statutes of limitation, even though it was filed following the effective date of the SOA.[18]

### III. CONCLUSION

This case came to us on interlocutory appeal from denial of Dean Witter's motion to dismiss to decide whether the SOA statute of limitations revived securities-fraud cases that were time-barred by the former statute of limitations. Following limited remand, inquiry-notice analysis has revealed that this class-action, securities-fraud case was time-barred by both the former statute of limitations and the SOA statute of limitations, when it was filed. Consequently, the question posed to us on interlocutory appeal is not presented on the facts of this case. On remand, the district judge will dismiss this case as untimely filed.

_____

[18] We want to be clear that we establish no brightline rule governing which statute of limitations applies in securities-fraud cases. Each case must be examined on its facts based on inquiry notice to determine whether the former or the SOA statute of limitations applies.

Therefore, the denial of Dean Witter's motion to dismiss is **REVERSED**, and this

case is **REMANDED** to the district judge to enter an order of dismissal.

EDMONDSON, Chief Judge, **CONCURS** in the result.